PUBLISH

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 5 1997**

**PATRICK FISHER**
**Clerk**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　　　Plaintiff-Appellee,

v.

IKE MCCLOUD, JR.,

　　　　Defendant-Appellant.

No. 96-3353

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 96-20031-01-DES)

---

**Submitted on the briefs:**[*]

Robin D. Fowler, Assistant United States Attorney (Jackie N. Williams, United States Attorney, with her on the brief), Topeka, Kansas, for Defendant-Appellant.

Bruce W. Simon, Kansas City, Missouri, for Plaintiff-Appellee.

---

Before ANDERSON, HENRY, and BRISCOE, Circuit Judges.

---

HENRY, Circuit Judge.

---

[*]　　After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The cause therefore is ordered submitted without oral argument.

On June 20, 1996, defendant-appellant Ike McCloud, Jr. was convicted by a jury of two counts of distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). He appeals directly to this court from that conviction and petitions us for a new trial because, he claims, the district court should have granted his motion to exclude evidence seized from his home and used by the government to convict him. Mr. McCloud contends that the evidence should be excluded because, although the police entered his house pursuant to a valid search warrant, they did not comply with 18 U.S.C. § 3109,[1] the "knock and announce" statute. If we do not grant Mr. McCloud a new trial, then he asks us to find that the district court erred in computing his offense level under the sentencing guidelines. We decline to remand for retrial because, if the district court erred in admitting the evidence seized at Mr. McCloud's home, such error was harmless beyond a reasonable

---

[1] As a point of clarification, both Mr. McCloud and the United States argued before the district court and in their briefs to this court that the officers' announcement and search were governed by 18 U.S.C. § 3109. However, because the state officers were executing a state warrant, see Rec. vol. VI, doc. 74, at 71-72, they were not governed in their actions by the federal statute but rather by the federal constitution, specifically the Fourth Amendment. See United States v. Mitchell, 783 F.2d 971, 973-74 (10th Cir. 1986). Under the Fourth Amendment, the officers must have acted reasonably in announcing their presence. See Richards v. Wisconsin, 117 S. Ct. 1416, 1421-22 (1997); Wilson v. Arkansas, 514 U.S. 927, 934-36 (1995). In his ruling, the district judge applied a reasonableness analysis consistent with the Fourth Amendment as embodied in § 3109, see United States v. Moore, 91 F.3d 96, 98 (10th Cir. 1996); United States v. Smith, 63 F.3d 956, 962 (10th Cir. 1995), vacated on other grounds, 116 S. Ct. 900 (1996), and we simply wish to clarify that although the standards are similar, the applicable law in this case is the Fourth Amendment.

2

doubt.  Additionally, we conclude that the district court correctly computed Mr. McCloud's offense level.  Therefore, we deny Mr. McCloud's motion for a new trial and his motion to remand for resentencing.

## I.    THE SEARCH OF MR. MCCLOUD'S RESIDENCE

A.    Standard of Review

"On appeal from a motion to suppress, we accept the district court's factual findings unless clearly erroneous, review questions of law de novo, and view the evidence in the light most favorable to the prevailing party."  United States v. Maden, 64 F.3d 1505, 1508 (10th Cir. 1995) (citation omitted).  "The reasonableness of a search and seizure under the Fourth Amendment is a question of law we review de novo."  United States v. McCarty, 82 F.3d 943, 947 (10th Cir. 1996).

B.    Background

At approximately 6:05 a.m. on Saturday, March 30, 1996, members of the Selective Crime Occurrence Reduction Enforcement (SCORE) unit, executed a search warrant on Mr. McCloud's residence at 7037 Haskell in Kansas City.  See Rec. vol. VI, doc. 74, at 16, 19-23.  The SCORE unit is the tactical unit of the Kansas City, Kansas, Police Department, and members of that unit have been

"specially trained" to serve warrants.  See id. at 20-21.  Officer Chris Alec Hopkins was responsible for announcing the SCORE unit's presence that morning, and he has personally been involved in the service of over 400 warrants. See id. at 22.  The government made no allegations of drugs or weapons at 7037 Haskell in its application for the search warrant; the purpose of the warrant was to search the house for books and records relating to Mr. McCloud's cocaine sales because, according to the officer-affiant, such documents are often kept at the home of drug sellers.  See id. at 16; Rec. vol. I, doc. 26, at 4 and attached Aff. in Support of a Search Warrant, Introduction ¶ c.

The SCORE unit arrived at Mr. McCloud's house at 6:05 a.m. because they expected the residents to be sleepy.  See Rec. vol. VI, doc. 74, at 44.  They stealthily approached the door of the home, see id. at 37-38, and hit it with a pry bar and battering ram.  See id. at 28, 35.  As is his custom, see id. at 27, Officer Hopkins began yelling "Police, search warrant" after he heard the officers hit the door.  See id. at 33, 36, 42.  Officer Hopkins was not aware whether there was a doorbell on the home or not, see id. at 34, but he evidently considered hitting the door with the pry tool and battering ram to be equivalent.  See id. at 42 (Mr. McCloud's attorney:  "By knocking you mean actual use of the pry tool?"  Officer Hopkins:  "That's certainly a knock, sir.").  Although the unit normally can enter a residence very quickly with the pry bar and battering ram, see id. at 28, they

4

could not get the pry bar properly wedged into the locked outer security door. See id.  Therefore, after roughly three strikes on the door with the battering ram, see id. at 35, 59, the police brought a set of hooks attached to a winch on a police van, set them on the outer door, and yanked it off its frame.  See id. at 28, 35. Roughly twenty seconds expired while the police were battering the door.  See id. at 60.  Another minute elapsed before the unit could attach the hooks and the winch and tear the door off its frame.  See id. at 61.  The inner door to the house was unlocked and opened with a turn of the knob.  See id. at 28, 34-35. Therefore, it was approximately one minute and 20 seconds before the police gained entry to the house.  See id. at 61.  During that time, no one inside said "hold up, we're coming to the door" or anything of that nature.  Id. at 28-29.  In fact, there were no sounds at all from inside the residence during the entry efforts. See id. at 29.

When they gained entry to the residence and searched the house, the SCORE unit found Mr. McCloud, his wife, and their eleven-month-old child in the back bedroom, see id. at 29-30, where they had been asleep.  See id. at 85. The police also discovered and seized roughly $6,000 and a sheet titled "Bills for March 1996" which referred to other residences where the police's cooperating witness had paid Mr. McCloud for drugs.  See Rec. vol. III, doc. 69, at 39-44.

5

Mr. McCloud moved to suppress the evidence obtained in the search of his residence. See Rec. vol. I, doc. 24. At the motion hearing, Officer Hopkins testified on direct examination that the announcement he has been trained to give has two purposes: (1) "it's a legal requirement," and (2) "we want the people inside that residence to know that we are, indeed, police officers because . . . [in] a shooting incident . . . the first thing they say is 'We didn't know they were policemen breaking into our house.'" See Rec. vol. VI, doc. 74, at 30-31. On cross-examination, he testified:

| | |
|---|---|
| Officer Hopkins: | [W]e try to be as stealthy as we can until we get up there. And then when I hear--once the banging--once they start knocking, banging on the door, and I make the announcement. |
| Mr. McCloud's atty: | In other words, your announcement is designed to alert the occupants to the fact that you are police officers and not criminals. |
| Officer Hopkins: | That is correct. |
| Mr. McCloud's atty: | It is not designed to invite the attention of the occupants of the house to open the door in response to the warrant. |
| Officer Hopkins: | That is an option that they can exercise, yes. |
| Mr. McCloud's atty: | Yes. It would be difficult to exercise this option without any notice, however, would it not, Officer? |
| Officer Hopkins: | That is correct. |
| Mr. McCloud's atty: | And, in fact, there was in this case no notice. As soon as there's hammering on the door, then at that point you're raising the cry, "search warrant, police." |
| Officer Hopkins: | That is correct. |

6

Id. at 37-38.

The court denied Mr. McCloud's motion to suppress because:

I don't believe this was simultaneous entry, and I think that's the--
the evil, if you will, that [18 U.S.C. § 3109] is aimed at deterring and
preventing so that people simply don't have the police coming
charging through the door, number one, either not announced or with
just simply a token simultaneous announcement.
        This case would have been more interesting if that door would
have popped off when [the SCORE unit was] trying to pry it with the
pry bar. However, perhaps fortunately for the Government, that
didn't happen. The amount of time that elapsed from the point that
Officer Hopkins commenced yelling and [the other members of the
unit] started hammering the door with the pry bar to the time that
they actually gained entry was roughly a minute and 20 seconds,
according to Hopkin's testimony. . . .
        . . . .
        . . . I think under these circumstances, the time frame was
reasonable.

Id. at 89-90.

C.    Analysis

Although the district court's determination that the search was reasonable,

resting as it did on the strength of Mr. McCloud's door,[2] suggests that the Kansas

---

[2]     The cases suggest that when the door "popped off" is not the yardstick by
which we measure reasonableness in knock and announce cases. Although we could find
no explicit statement of law directly on point, our review of precedent indicates that the
reference point for the reasonableness determination is the amount of time between when
the officers begin to announce their presence and when the officers hit the door with a
battering ram or other implement which could destroy the door and allow them entry.
See, e.g., Smith, 63 F.3d at 963 (concluding that there was constructive denial of entry
when "an interval of 'probably 45 seconds' elapsed from the time that the officers had

City Police Department is relying more on luck than on constitutional mandates,[3] we have no legal problem with the outcome of the district court's ruling because any error was harmless beyond a reasonable doubt.

tried the door and found it locked until the door was struck with the battering ram"); United States v. Markling, 7 F.3d 1309, 1318 (7th Cir. 1993) (holding that there was constructive denial of entry when "the officers waited seven seconds before starting to try to knock the door down"). This view comports with the policies behind the announcement requirement and the Fourth Amendment; were we to use the actual breaking of the door as the time when constructive denial occurs, innocent people could have their doors or other parts of their houses significantly damaged or destroyed before they had any notice which would allow them to admit the police and avoid destruction of their property. See Wilson v. Arkansas, 514 U.S. 927, 931 (1995) ("[F]or the law without a default in the owner abhors the destruction or breaking of any house (which is the habitation and safety of man) by which great damage and inconvenience might ensue to the party, when no default is in him; for perhaps he did not know of the process, of which, if he had notice, it is to be presumed he would obey it.") (quoting Semayne's Case, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195-96 (K.B. 1603); United States v. Bates, 84 F.3d 790, 794 (6th Cir.) ("As recognized by other Circuits addressing this issue, the interests protected by § 3109 include . . . the needless destruction of private property . . .") (internal quotation marks omitted); United States v. Ramirez, 91 F.3d 1297, 1300 (9th Cir. 1996) (stating that Fourth Amendment concern for the privacy, safety, and property of citizens is reflected in knock and announce requirements and determining that a defendant's property was needlessly damaged when the police broke into his home), cert. granted, 117 S. Ct. 2478 (1997).

[3] We seem to be reviewing the actions of Kansas police executing "knock and announce" warrants with some frequency. See United States v. Myers, 106 F.3d 936, 940 (10th Cir.) ("The use [by Kansas Bureau of Investigation agents dressed completely in black and wielding automatic machine guns] of a 'flashbang' device in a house where innocent and unsuspecting children sleep gives us great pause."), cert. denied, 117 S. Ct. 2446 (1997); Moore, 91 F.3d at 97-99 (suppressing evidence as unreasonably obtained when Wichita Police Department officers were successful in opening door with battering ram no more than three seconds after first announcement); Jenkins v. Wood, 81 F.3d 988, 996-98 (10th Cir. 1996) (Henry, J., concurring) ("I believe that the [Kansas Bureau of Investigation and the City of Topeka Police Department] would do well to reevaluate their policies (or lack thereof)--whoever makes them and whatever they are--regarding [their] tactics in the execution of search warrants").

If evidence was obtained in violation of the Fourth Amendment and admitted at trial, the government must prove beyond a reasonable doubt that such evidence did not contribute to the guilty verdict. See Chapman v. California, 386 U.S. 18, 24 (1967). In United States v. Hill, 60 F.3d 672, 681 (10th Cir.), cert. denied, 116 S. Ct. 432 (1995), this court read Chapman to require that the appellate court be able to declare a belief that the constitutional error was harmless beyond a reasonable doubt. See id. We now review the record to determine if we can make such a declaration.

As mentioned above, from 7307 Haskell the government seized and admitted into evidence roughly $6,000 in cash and a document which tended to show that Mr. McCloud was paying bills for the three other residences where the cooperating witness had paid him for drugs and seen him cooking crack. The government also elicited testimony that the $6,000 was seized in the search of Mr. McCloud's residence and that drug transactions are normally conducted in cash. If we excise this peripheral evidence from the government's case, proof of Mr. McCloud's drug trafficking is hardly less overwhelming.

The government called more than a dozen witnesses and presented the following evidence to the jury of Mr. McCloud's guilt:

(1)     testimony which was corroborated by at least two witnesses

9

(a)     that Mr. McCloud was the cooperating witness's (hereinafter "CW") cocaine supplier,

(b)     that Mr. McCloud had fronted the CW four-and-a-half ounces of crack cocaine for which the CW owed Mr. McCloud $3,500,

(c)     that the police gave the CW $3,500 to pay Mr. McCloud for the four-and-a-half ounces of crack cocaine and made tapes of the transaction in which the CW gave the $3,500 to Mr. McCloud,

(d)     that Mr. McCloud had fronted the CW three ounces of crack cocaine, which the CW turned over to the police,

(e)     that the police gave the CW $1,000 and then $1,700 to pay Mr. McCloud for the three ounces of crack cocaine and made tapes of those transactions,

(f)     that Mr. McCloud fronted the CW nine ounces of crack cocaine, which the CW turned over to the police,

(g)     that the police gave the CW $2,500 and then $3,000 to pay for the nine ounces of crack cocaine and made tapes of the transactions,

(h)     that the police videotaped the CW paying Mr. McCloud for crack cocaine,

(i)     that the police audio taped the CW paying Mr. McCloud for crack cocaine, receiving crack cocaine from Mr. McCloud, watching Mr. McCloud cook powder cocaine into crack, and discussing cocaine sales, distribution, and use,

(j)     that the police seized from the houses where the drug transactions occurred (not 7037 Haskell) baggies of the type normally used to package crack cocaine, items normally used to cook cocaine into crack, including baking soda, scales normally used for weighing crack, and a .44 caliber pistol;

(2)     uncorroborated testimony from the CW

(a)     that he had been purchasing crack cocaine from Mr. McCloud in seven and fourteen gram quantities for three or four months before he was arrested and began cooperating with the police,

(b)     that he had watched Mr. McCloud cook the three ounces of crack cocaine which Mr. McCloud then fronted him,

(c)     that he watched Mr. McCloud cook an additional nine ounces of cocaine which Mr. McCloud kept;

(3)     tapes played to the jury including

(a)     video and audiotape of the CW paying Mr. McCloud the $3,500 for the four-and-a-half ounces of fronted cocaine,

11

(b)     audio tape of the CW paying Mr. McCloud the $1,000 for the three ounces of crack cocaine and generally discussing cocaine sales and use,

(c)     audio tape of the CW paying Mr. McCloud the remaining $1,700 due for the three ounces of crack cocaine and of Mr. McCloud asking for $7,500 for the nine ounces of crack cocaine he fronted the CW,

(d)     audio tape of the CW paying Mr. McCloud for the nine ounces of crack cocaine he fronted the CW and of the CW and Mr. McCloud discussing the size and quantity of drugs the CW was buying from Mr. McCloud.

Mr. McCloud called no witnesses. His entire defense consisted of cross-examination of several witnesses which revealed nothing exculpatory except possible bias on the part of the CW because the CW was cooperating with police after being arrested for selling crack cocaine. However, the government countered that possible inference of bias by showing that although the CW had given them Mr. McCloud's name and agreed to cooperate in hopes of avoiding prison, he had not been promised immunity or made any deals with prosecutors as of the time of trial.

Mr. McCloud is equally unpersuasive in responding to the overwhelming evidence of his guilt before this court. He merely states that "[t]he admission into evidence of material seized from the Haskell property must have worked to the detriment of the defendant in the present case." Aplt's Br. at 15. Such a perfunctory response to the government's strong case suggests our review has already been too lengthy. We therefore simply conclude by finding that the evidence at trial overwhelmingly showed Mr. McCloud's guilt and, thus, that any possible constitutional violation which occurred when the court admitted the evidence seized in the search of Mr. McCloud's residence was harmless beyond a reasonable doubt.

## II.   SENTENCE COMPUTATION

The district court concluded that Mr. McCloud had a criminal offense level of thirty-eight and a criminal history category of five, see Rec. vol. V, doc. 71, at 38, and sentenced him in accordance with the United States Sentencing Guidelines to 360 months incarceration. See id. at 43. In this appeal, Mr. McCloud raises four objections to his sentence: (1) that there was not sufficient evidence to support the inclusion of nine ounces of cocaine in the quantity of cocaine for which he was responsible; (2) that the district court should have made a downward departure from the sentencing guidelines because there is no actual

13

difference between crack cocaine and powder cocaine; (3) that the district court erred in concluding that Mr. McCloud was in possession of a firearm during his offense; and (4) that the district court erred in treating three of his juvenile offenses as non-related for the purposes of computing his criminal history level.

A.     Standards of Review

"Although we review the district court's application of the sentencing guidelines de novo, we review the sentencing court's factual findings under a clearly erroneous standard.  Thus, a sentencing court's determination of the quantity of drugs attributable to a defendant is reviewed for clear error." United States v. Morales, 108 F.3d 1213, 1225 (10th Cir. 1997) (citations omitted).

B.     Cocaine Quantity

The presentence report computed the total amount of cocaine base to be considered under the sentencing guidelines at 704.92 grams.  See Presentence Investigation Report (hereinafter "PIR") ¶ 12.  This amount included nine ounces (255.15 grams) which the cooperating witness reported seeing and to which Mr. McCloud referred during an audio-taped exchange.  See Rec. vol. V, doc. 71, at 7-8, 18-19.  Mr. McCloud objected to the addition of this nine ounces because he did not feel there was sufficient evidence to support its inclusion.  See id. at 28-

29; PIR ¶ 74. Without the disputed nine ounces, Mr. McCloud's offense level would have been thirty-four (for 449.77 grams of cocaine base), <u>see</u> U.S.S.G. § 2D1.1(c)(3), rather than thirty-six (for 704.92 grams). <u>See</u> <u>id.</u> at (c)(2). The district court overruled the objection and included the nine ounces in its sentencing computation. <u>See</u> Rec. vol. V, doc. 71, at 31-33, 36; PIR ¶ 81.

"In determining the quantity of drugs involved, the government is not limited to the amount . . . for which a defendant was convicted, and a defendant is responsible for 'all quantities . . . with which he was directly involved.'" <u>United States v. Sloan</u>, 65 F.3d 861, 865 (10th Cir. 1995) (quoting U.S.S.G. § 1B1.3, commentary, application note 2), <u>cert. denied</u>, 116 S. Ct. 824 (1996). "The government has the burden of proving the quantity of drugs for sentencing purposes by a preponderance of the evidence." <u>Id.</u> (citing <u>United States v. Garcia</u>, 994 F.2d 1499, 1508 (10th Cir. 1993)). The district court heard the testimony of the cooperating witness that he saw Mr. McCloud make the nine ounces of cocaine base in question, and the court reviewed the transcript of the tape recording in which Mr. McCloud says he is cooking "another nine" of crack. Mr. McCloud proffered no evidence to rebut this proof and merely called into question the cooperating witness's reliability. "The credibility of a witness whose testimony is relied upon at sentencing is for the sentencing court to analyze." <u>Id.</u> After reviewing the record, we are satisfied that the district court was not clearly

15

erroneous in its determination that the government satisfied its burden in attributing the additional nine ounces of cocaine to Mr. McCloud.

C.      Disparity in Length of Sentences Between Crack and Powder Cocaine

Mr. McCloud asked for a downward departure from the sentencing guidelines because of what he contends is a merely nominal difference between crack cocaine and powder cocaine. See PIR ¶ 75. The district court rejected his request. See id. ¶ 81; Rec. vol. V, doc. 71, at 36.

"District courts have statutory authority to depart downward from Guideline sentences if 'the court finds that there exists . . . [a] mitigating circumstance of a kind . . . not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" United States v. Maples, 95 F.3d 35, 37 (10th Cir. 1996) (quoting 18 U.S.C. § 3553(b)), cert. denied, 117 S. Ct. 716 (1997). Congress has considered and rejected the argument made by Mr. McCloud, see id. at 37, leading this Circuit to conclude that "the expansive issue of appropriate sentencing levels for crack offenses is not the sort of discrete, individual and case-specific mitigating circumstance justifying downward departure under 18 U.S.C. § 3553(b)." Id. at 37-38. Therefore, the district court was correct in refusing to depart downward

16

from the Guidelines based on Mr. McCloud's argument that there is no difference between powder and crack cocaine.

D.    Possession of a Firearm

Mr. McCloud disagrees with the district court's conclusion that, during the course of his criminal activity, "a dangerous weapon (including a firearm) was possessed," enhancing his offense level by two points. U.S.S.G. § 2D1.1(b)(1). The cooperating witness told police that Mr. McCloud was in possession of two assault rifles during two meetings between the confidential informant and Mr. McCloud. See Rec. vol. V, doc. 71, at 34. During the execution of several search warrants, the police found both of the described weapons, loaded, and a loaded .44 caliber pistol at a location where drug activity took place. See id.

"The [U.S.S.G. § 2D1.1 two level] enhancement for weapon possession . . . . should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1, commentary, application note 3. As the district court noted, the police found the loaded .44 caliber pistol at the site of one of the drug transactions between Mr. McCloud and the cooperating witness. The loaded assault rifles were also found in a car that the police suspected was used to transport drugs. It was not clearly improbable that these weapons were connected with Mr. McCloud's drug distribution. See

17

<u>United States v. Hallum</u>, 103 F.3d 87, 89 (10th Cir. 1996) (holding that weapon which was accessible to criminals while they were involved in drug cultivation activity was not clearly improbably possessed in connection with the offense), <u>cert. denied</u>, 117 S. Ct. 1710 (1997), and we agree with the district court's determination that a dangerous weapon was possessed in connection with Mr. McCloud's offense.

E.      <u>Criminal History</u>

Mr. McCloud objects to the district court treating three of his prior juvenile dispositions separately, rather than as related offenses, for the purpose of computing his criminal history points. <u>See</u> PIR ¶¶ 92-94; Rec. vol. V, doc. 71, at 30, 35. Mr. McCloud was arrested on the first of the charges in question on December 18, 1990, and he committed the second offense on April 6, 1991. He was arrested on the second offense on April 6, 1991, and he committed the third offense on August 11, 1991 (the same date he was arrested for that offense). Using as evidence the fact that he was sentenced on all three offenses on October 25, 1991, <u>see</u> PIR ¶¶ 31-33, Mr. McCloud asked that the district court treat the juvenile cases as related offenses and reduce his criminal history score as figured in the presentence report by four points, to six from ten. <u>See</u> id. at ¶ 92; U.S.S.G. § 4A1.2.(a)(2) ("Prior sentences imposed in related cases are to be treated as one

sentence for purposes of [computing criminal history] under § 4A1.1(a), (b), and (c).").  The district court overruled the objection.  <u>See</u> PIR ¶ 99; Rec. vol. V, doc. 71, at 37.

"Prior sentences are not considered related if they were for offenses that were separated by an intervening arrest (i.e. the defendant is arrested for the first offense prior to committing the second offense.)" U.S.S.G. § 4A1.2, commentary, application note 3.  As detailed above, Mr. McCloud was arrested for offense number one (12/18/90) before he committed offense number two (4/6/91), and he was arrested for offense number two (4/6/91) before he committed offense number three (8/11/91).  Under the plain language of Application Note 3 to U.S.S.G. § 4A1.2, "which we are bound to follow unless shown to be either plainly erroneous or inconsistent with federal law," <u>United States v. Alberty</u>, 40 F.3d 1132, 1133 (10th Cir. 1994), Mr. McCloud's juvenile adjudications are not related.  Therefore, we agree with the district court's findings on this issue as well.

### III.   CONCLUSION

For the aforementioned reasons, we affirm the judgment and the sentence imposed.