FILED
United States Court of Appeals
Tenth Circuit

September 5, 2007

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

     Plaintiff - Appellee,

v.

JOSHUA CHAD BECKSTEAD,

     Defendant - Appellant.

No. 05-4178

---

**Appeal from the United States District Court
for the District of Utah
(D.C. No. 2:04-CR-115-02-BSJ)**

---

Mary C. Corporon, Corporon, Williams & Bradford, P.C., Salt Lake City, Utah, for Defendant-Appellant Joshua Chad Beckstead.

Diana Hagen, Assistant United States Attorney (Stephen J. Sorenson, United States Attorney, with her on the brief), Salt Lake City, Utah, for Plaintiff-Appellee United States of America.

---

Before **HARTZ, EBEL** and **McCONNELL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

In this direct criminal appeal, Defendant-Appellant Joshua Beckstead challenges four convictions and a twenty-year sentence resulting from his involvement with a methamphetamine lab. Among other things, Beckstead claims

that the Government denied him due process because officers seized and immediately disposed of the methamphetamine lab pursuant to standard police department policy. The department's policy was developed in response to the dangers generally presented by methamphetamine labs and the chemicals associated with them. But Beckstead argues that by destroying this evidence, officers deprived him of any opportunity to test the lab for fingerprints which might have eliminated him as the lab's operator, and deprived him of the ability to challenge the amounts of chemicals seized. Those weights helped determine the length of Beckstead's sentence. Because Beckstead has failed to show that the police officers acted in bad faith when they destroyed this potentially exculpatory evidence, we conclude the Government did not deny Beckstead due process. Having jurisdiction to consider this appeal under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, we reject this challenge, as well as Beckstead's other appellate arguments, and AFFIRM his convictions and sentence.

## I. BACKGROUND

The evidence presented at trial, viewed in the light most favorable to the Government, see United States v. Torres-Laranega, 476 F.3d 1148, 1157 (10th Cir. 2007) (reviewing sufficiency of evidence supporting conviction), petition for cert. filed, (U.S. May 22, 2007) (No. 06-11907), established the following: Beckstead bought 500 grams of iodine and some ephedrine from the friend of a friend in January 2004. A few weeks later, he bought 8,000 pills, or 480 grams,

2

of ephedrine from the same person. These ingredients can be used to manufacture methamphetamine. In fact, the amount of iodine Beckstead purchased, combined with other ingredients, could produce 166.67 grams of methamphetamine, while the amount of ephedrine Beckstead purchased could produce 240 grams of methamphetamine.

On February 9, 2004, two police officers saw Beckstead and a woman leave an apartment building, get into a black car and apparently drive away. The officers were at the apartment complex investigating an anonymous tip about a methamphetamine lab. Acting on that tip, officers found such a lab in apartment number nine, which was rented by Beckstead's former girlfriend, Ray Lynn Morris. In addition, officers found 1,233.2 grams of red phosphorus, as well as other chemicals used to manufacture methamphetamine. With this amount of red phosphorus, an individual could, if he had enough of the other required ingredients, manufacture 1,233.2 grams of methamphetamine. During a search of Morris' apartment, officers also found Beckstead's driver's license in one of the bedrooms.

As officers were leaving the apartment, after disassembling the lab, they saw the car in which Beckstead had earlier driven away, parked again in the apartment complex's parking lot. In that car, which was registered to Beckstead's parents, officers found additional components for a methamphetamine lab.

The United States indicted both Beckstead and Ray Lynn Morris' father,

3

Kevin James, on four charges: 1) attempting to manufacture fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 846; and possessing 2) pseudoephedrine 3) red phosphorus and 4) iodine with the intent to manufacture methamphetamine, in violation of 21 U.S.C. § 841(c)(1).[1]

Beckstead filed a motion to dismiss based on the Government's destruction of the evidence. In that motion, Beckstead argued, apparently pursuant to California v. Trombetta, 467 U.S. 479 (1984), that the Government acted in bad faith. The district court denied that motion, implicitly finding that the Government did not act in bad faith.

James pled guilty and testified against Beckstead at his trial. James, who had been staying at his daughter's apartment for a few days at the time officers

---

[1] 21 U.S.C. § 841(a)(1) makes it "unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense a controlled substance." Methamphetamine is a controlled substance. See 21 U.S.C. § 812, Schedule III (a)(3). And 21 U.S.C. § 846 provides that "[a]ny person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

In addition, 21 U.S.C. § 841(c)(1) makes it unlawful for "[a]ny person [to] knowingly or intentionally . . . possess[] a listed chemical with intent to manufacture a controlled substance except as authorized by this subchapter." List I includes "a chemical specified by regulation of the Attorney General as a chemical that is used in manufacturing a controlled substance." 21 U.S.C. § 802(34). Red phosphorus and pseudoephedrine are list I chemicals, see 21 U.S.C. § 802(34)(K); 21 C.F.R. § 1310.02(a)(25), while iodine is a list II chemical, 21 U.S.C. § 802(35)(I).

4

discovered the methamphetamine lab, testified that it was Beckstead and several other individuals who were operating the lab in Ray Lynn Morris' apartment.

A jury convicted Beckstead of all four charges. Pursuant to 21 U.S.C. § 841(b)(1)(A), Beckstead's conviction on count one subjected him to a mandatory minimum twenty-year sentence because he had a prior conviction for operating a methamphetamine lab.[2] The presentence report ("PSR") provided for a higher advisory guideline sentencing range of between 360 months and life imprisonment. At sentencing, however, the district court concluded that a sentence below that guideline range was warranted and instead imposed the statutory mandatory minimum twenty-year sentence. Beckstead now appeals both his convictions and sentence.

## II. ANALYSIS

### A.    Destruction of potentially exculpatory evidence

Beckstead argues that the Government deprived him of due process because officers immediately seized and destroyed the methamphetamine lab components and related chemicals found at Morris' apartment and in Beckstead's car.[3]

_____

[2]Such an offense involving fifty grams or more of methamphetamine would have ordinarily carried a sentence of not less than ten years, nor more than life in prison. See 21 U.S.C. § 841(b)(1)(A)(viii). However, because Beckstead had a prior drug-related conviction, among others, he was subject instead to a sentence of not less than twenty years, nor more than life imprisonment. See 21 U.S.C. § 841(b)(1)(A)(viii).

[3]It was actually employees of Envirosolve who disposed of the lab.

(continued...)

5

Beckstead contends that by destroying this potentially exculpatory evidence, officers deprived him of any opportunity to test the lab for fingerprints which might have eliminated him as the lab's operator, and deprived him of the ability to challenge the amounts of chemicals seized.

To establish that the Government deprived him of due process by destroying potentially exculpatory evidence, Beckstead must show both that 1) the evidence destroyed was potentially exculpatory and 2) the government acted in bad faith in destroying it.[4] See United States v. Bohl, 25 F.3d 904, 910-11 (10th Cir. 1994). For purposes of this appeal, we will assume that the

_____

[3](...continued)
Envirosolve is a private company contracted to clean up and dispose of such labs seized by police. The company's employees, however, acted only at the specific direction of police officers. Under these circumstances, we will treat the destruction of the methamphetamine lab as the government action necessary to support a due process claim. Cf. Bullock v. Carver, 297 F.3d 1036, 1041, 1056-57 (10th Cir. 2002) (declining to treat child therapist and clinical director of privately operated sexual abuse treatment center as state agent for purposes of due process claim challenging Government's failure to preserve evidence). The Government does not argue that we should do otherwise.

[4]The Government has a duty to preserve evidence if its exculpatory value is "'apparent'" and it is "'of such a nature that the defendant would be unable to obtain comparable evidence of other reasonably available means.'" United States v. Gomez, 191 F.3d 1214, 1218-19 (10th Cir. 1999) (quoting Trombetta, 467 U.S. at 488-89); see also Bullock, 297 F.3d at 1056. For the most part, however, Beckstead argues only that the evidence destroyed in this case is potentially exculpatory, requiring Beckstead to prove the Government acted in bad faith in destroying it. To the extent Beckstead is also arguing that it was apparent–before officers destroyed the methamphetamine lab in this case–that it was exculpatory evidence, we reject that assertion.

destroyed evidence was potentially exculpatory and will consider here only whether the Government acted in bad faith when officers destroyed it.[5]

"[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood, 488 U.S. 51, 58 (1988); see also Snow v. Sirmons, 474 F.3d 693, 716 (10th Cir. 2007).

> [W]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed. Part of it stems from our unwillingness to read the fundamental fairness requirement of the Due Process Clause as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases

---

[5]It is not necessarily obvious that the fingerprints on the lab equipment and the weight of precursor chemicals would be potentially exculpatory. Even if Beckstead had been able to test the lab components and had not found his fingerprints on them, that does not mean that he was not associated with the lab. And if Beckstead found other people's fingerprints on the lab, that again would not necessarily exonerate him. There were many people besides Beckstead in and out of the apartment. And James testified that Beckstead had been operating the lab with several other people.

As for the amount of chemicals seized, the jury found that Beckstead had attempted to manufacture at least fifty grams of methamphetamine. The amount of red phosphorus police reportedly seized in Morris' apartment would have made at least that much methamphetamine. It is the weight of the red phosphorus that Beckstead vigorously disputes. Nevertheless, there was also testimony that Beckstead, several weeks earlier, had purchased ephedrine and iodine from a friend of a friend. These chemicals, completely apart from the red phosphorus seized with the lab, would have also supported the jury finding that Beckstead had attempted to manufacture at least fifty grams of methamphetamine.

7

where the interests of justice most clearly require it, i.e., those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

Youngblood, 488 U.S. at 57-58 (quotations, citations omitted); see also Illinois v. Fisher, 540 U.S. 544, 547-48 (2004) (per curiam); Snow, 474 F.3d at 716.

We review the district court's determination that the Government did not act in bad faith for clear error. See Gomez, 191 F.3d at 1219. Beckstead bears the burden of establishing that the Government acted in bad faith. See Bohl, 25 F.3d at 913.

The presence or absence of bad faith necessarily turns on the Government's knowledge of the evidence's potentially exculpatory value. See Youngblood, 488 U.S. at 56 n.*. Generally, however, destroying the evidence according to "an established procedure," as the Government did here, "precludes a finding of bad faith absent other compelling evidence." Gomez, 191 F.3d at 1219 (quotation omitted).

This court considers several factors in determining whether the Government acted in bad faith, see Bohl, 25 F.3d at 911-13:

1) *Did the Government have explicit notice that Beckstead believed the methamphetamine lab and its chemicals were exculpatory?* See id. at 911. In this case, the Government appears to have destroyed this evidence before Beckstead had an attorney or any opportunity to notify government officials that the lab and its chemicals were potentially exculpatory. Cf. id. (noting Government "was

8

explicitly placed on notice that [the defendants] believed" the evidence was potentially exculpatory where defendants sent the government numerous letters to that effect); United States v. Cooper, 983 F.2d 928, 931 (9th Cir. 1993) (determining Government was on notice that lab equipment was potentially exculpatory where, during pre-seizure investigation, defendant's parole officer and the lab's landlord reported that the business operating the lab claimed it was for legitimate scientific purposes; and after seizure, but before the Government destroyed the evidence, Government agents were again told lab equipment was set up for legitimate purposes and was structurally incapable of producing methamphetamine). In this case, while Beckstead admittedly did not have much of an opportunity to notify the Government that this evidence was potentially exculpatory, neither did the Government destroy it in the face of a contrary request from Beckstead to preserve it, see Bohl, 25 F.3d at 911.

2) *Is Beckstead's claim that this evidence is potentially exculpatory conclusory, or is it "instead . . . backed up with objective, independent evidence giving the government reason to believe that further tests on the [destroyed evidence] might lead to exculpatory evidence"?* Id. In this case, Beckstead's arguments are conclusory. He does not point to any other, independent evidence that would have suggested to the Government, at the time it destroyed this evidence, that further testing of the methamphetamine lab might produce exculpatory evidence. Cf. Cooper, 983 F.2d at 931 (holding destruction of lab

9

equipment, in the face of evidence corroborating the potentially exculpatory nature of that equipment, obtained from sources other than the defendants, was in bad faith).

In fact, the evidence the Government had at the time it destroyed this evidence was just to the contrary. The samples officers took of the chemicals found with the lab indicated they were precursors to methamphetamine production. Officers also found some methamphetamine with the lab. When discovered, officers recognized the equipment as a methamphetamine lab. Officers photographed the lab pieces before and after they were disassembled, and documented the pieces of lab equipment they found. From those photographs, a Government expert testified that the lab, as constructed, was capable of producing methamphetamine. Further, the Government did try, apparently unsuccessfully, to obtain fingerprints from the lab equipment before it was destroyed. Moreover, even if, as he argues, Beckstead's fingerprints were not on the lab components found in the apartment, that fact alone would not necessarily exculpate him. See Torres v. Mullin, 317 F.3d 1145, 1161 (10th Cir. 2003) (addressing whether destroyed fingerprints were potentially exculpatory).

Given what officers knew at the time they destroyed the methamphetamine lab, they would not have had objective "reason to believe that further tests on the [destroyed evidence] might lead to exculpatory evidence." Bohl, 25 F.3d at 911.

3) *Did the Government still have the ability to control the disposition of*

10

*the evidence at the time Beckstead indicated that the methamphetamine lab and its chemicals might be exculpatory?* See id. at 912. Beckstead has not asserted any evidence indicating that this was the case here. Rather, it appears that the Government destroyed the evidence before Beckstead raised the possibility that it was exculpatory.

4) *Was the evidence disposed of central to the case?* See id. The answer to this inquiry is clearly yes. The lab found in Morris' apartment and the lab equipment found in Beckstead's car were central to Beckstead's conviction for attempting to manufacture methamphetamine; and the red phosphorus seized at Morris' apartment presumably would have supported the jury's finding that Beckstead attempted to manufacture over fifty grams of methamphetamine, as well as providing the basis for Beckstead's conviction for possessing red phosphorus. See generally United States v. Donaldson, 915 F.2d 612, 614 (10th Cir. 1990) (noting Youngblood's analysis also applies to sentencing proceedings).

5) *Does the Government offer any innocent explanation for its failure to preserve the evidence?* See Bohl, 25 F.3d at 912. Clearly it does. Officers and Envirosolve technicians testified that they removed and destroyed the lab and its chemicals in this case pursuant to the police department's standard policy. This policy is based upon the significant dangers that such a lab and the chemicals associated with it present. For example, Officer Wersland testified at a pretrial evidentiary hearing that the fumes in a trash bag used as a vent for a

11

methamphetamine lab could kill a person, should the bag rupture. And many of the chemicals associated with the production of methamphetamine are combustible, toxic or corrosive, and very dangerous.

Beckstead does not dispute this evidence. Instead, he asserts that the Government could, nevertheless, have carefully preserved the evidence. The fact that the Government could preserve the evidence, however, is not dispositive. The same was true in Trombetta, where officers destroyed breath samples used to support drunk driving charges, even though it was "technically feasible" for police to preserve those samples. See 467 U.S. at 481-83. The Supreme Court, nevertheless, concluded that officers' destruction of this potentially exculpatory evidence "in accord with their normal practice" did not amount to bad faith, and therefore did not deprive the defendant of due process. See id. at 486-89.

Considering Bohl's factors, we conclude that the officers in this case did not act in bad faith when they destroyed the components of the methamphetamine lab and the chemicals found with it. Officers were acting pursuant to the department's standard policy, and there is no evidence suggesting that they were otherwise acting in bad faith.

Our conclusion mirrors decisions by other courts in similar cases. In United States v. Heffington, 952 F.2d 275 (9th Cir. 1991), for example, the Ninth Circuit rejected a similar Youngblood claim because the police had destroyed a methamphetamine lab "in compliance with 'departmental procedures.' This

12

routine disposal of the evidence was apparently not the product of any realization that the evidence could form a basis for exonerating the defendant. Significantly, [the defendant] does not claim that the government knew that any test would exonerate him." Id. at 281 (quotations, alterations omitted).

And in other circumstances, the Supreme Court, as well as this court, has similarly rejected Youngblood claims where the Government destroyed potentially exculpatory evidence pursuant to standard policy. See Fisher, 540 U.S. at 545, 547-49 (rejecting due process claim where Government, acting in good faith and pursuant to "normal police procedures," destroyed cocaine seized during traffic stop ten years earlier); United States v. LaVallee, 439 F.3d 670, 697, 699 (10th Cir. 2006) (rejecting due process claim where Bureau of Prisons destroyed videotape two years after it was created, pursuant to the Bureau's policy, and there was no indication that the Bureau was acting in bad faith when it did so); Gomez, 191 F.3d at 1217, 1219 (rejecting due process claim where Government destroyed most of the marijuana it had charged Gomez with possessing, pursuant to the Government's "ordinary statutory procedures"). See generally Bohl, 25 F.3d at 912-13 (noting that "courts have held that the government does not necessarily engage in bad faith conduct when the destruction of evidence results from a standard procedure employed by the governmental department or agency regarding the disposal of like evidence, at least when there is adequate documentation of the destroyed evidence").

13

In this case, undisputed evidence indicates that the Government destroyed the methamphetamine lab pursuant to an established and routinely followed department policy. Beckstead fails to present any evidence that suggests that the Government, in this particular case, was nevertheless acting in bad faith when it destroyed the lab and its related chemicals. The district court, therefore, did not err in rejecting Beckstead's due process argument. See United States v. Ward, 182 Fed. Appx. 779, 783-86 (10th Cir. 2006) (unpublished) (reaching same conclusion in similar case), cert. denied, 127 S. Ct. 422 (2006).

**B.    Fourth Amendment issues**

Beckstead next asserts two Fourth Amendment challenges to his convictions. He argues that officers unlawfully searched both 1) his former girlfriend Morris' apartment and 2) his car, which was parked outside Morris' apartment.

The district court denied Beckstead's pretrial motion to suppress. When reviewing the denial of a motion to suppress, this court views the evidence in the light most favorable to the Government. See United States v. Mitchell, 429 F.3d 952, 958 (10th Cir. 2005).

> We accept the district court's factual findings unless they are clearly erroneous. The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court. However, the ultimate determination of reasonableness [of the search] under the Fourth Amendment is a question of law that we review de novo.

14

Id. (quotations, citations omitted).

## 1. Search of Beckstead's former girlfriend's apartment

The district court denied Beckstead's motion to suppress the evidence officers found when they searched Morris' apartment, holding that Beckstead lacked standing to challenge that search. On appeal, however, Beckstead does not even address his standing to challenge this search until his reply brief.[6]

> It is our general rule . . . that arguments and issues presented at such a late stage are waived. . . . [T]he reasons for our rule are two-fold: First, to allow an appellant to raise new arguments at this juncture would be manifestly unfair to the appellee who, under our rules, has no opportunity for a written response. Secondly, it would also be unfair to the court itself, which, without the benefit of a response from appellee to an appellant's late-blooming argument, would run the risk of an improvident or ill-advised opinion, given our dependence as an Article III court on the adversarial process for sharpening the issues for decision.

Hill v. Kemp, 478 F.3d 1236, 1250-51 (10th Cir. 2007) (quotations, alterations omitted); see also Stump v. Gates, 211 F.3d 527, 533 (10th Cir. 2000) (noting this court ordinarily does not permit appellant to raise new issues for the first time in his reply brief because it "robs the appellee of the opportunity to demonstrate that

---

[6]In his reply brief, Beckstead asserts that the district court's ruling on standing was unclear. But that does not appear to be the case. During a hearing on Beckstead's motion to suppress, the district court stated "I don't think either Beckstead or [his co-defendant] has standing." In a later hearing, the district court reiterated that Beckstead "wasn't there. He's not a tenant in the apartment. He can't complain about the actions of the officers. It isn't his apartment." And in an unsuccessful motion to renew his suppression motion, Beckstead acknowledged that the district court had denied his first suppression motion "for lack of standing."

15

the record does not support an appellant's factual assertions and to present an analysis of the pertinent legal precedent that may compel a contrary result"). By failing to address this issue until his reply brief, Beckstead has waived it.[7] See United States v. Cantley, 130 F.3d 1371, 1377-78 (10th Cir. 1997) (affirming district court's decision to deny suppression motion because appellant did not dispute on appeal district court's conclusion that he lacked standing to challenge the search at issue). And because "[i]t is fundamental law that a person desiring to have evidence suppressed must first show that he has standing to object to the search," we need not further address his challenges to the constitutionality of the search of his former girlfriend's apartment. United States v. Deninno, 29 F.3d 572, 576 (10th Cir. 1994); see also Cantley, 130 F.3d at 1377-78.

Even if we were to address the merits of the district court's standing determination, however, it would not warrant relief. A "person has standing only to challenge the violation of his own Fourth Amendment rights." United States v. Ladeaux, 454 F.3d 1107, 1112 (10th Cir. 2006). "Fourth Amendment rights are personal, and, therefore, a defendant cannot claim a violation of his Fourth Amendment rights based only on the introduction of evidence procured through an illegal search and seizure of a third person's property or premises." United States v. DeLuca, 269 F.3d 1128, 1131 (10th Cir. 2001) (quotation omitted).

_____

[7]This is also true of Beckstead's argument, asserted for the first time in his reply brief, that the district court erred in refusing to permit Beckstead to reassert his suppression motion, based upon newly discovered evidence.

16

The relevant question presented here is whether Beckstead "manifested a subjective expectation of privacy in the area searched and whether society is prepared to recognize that expectation as objectively reasonable." United States v. Valdez Hocker, 333 F.3d 1206, 1208-09 (10th Cir. 2003) (quotation omitted). It is Beckstead's "burden of demonstrating that he had a personal Fourth Amendment interest that was implicated by the search . . . ." United States v. Jones, 213 F.3d 1253, 1260 (10th Cir. 2000). The district court concluded that Beckstead did not have standing to object to the search of the apartment. We review the district court's factual findings for clear error, and the court's legal conclusions de novo. Valdez Hocker, 333 F.3d at 1208.

Beckstead argues that he met his burden of proof in light of the evidence presented at the pretrial suppression hearing that one of the two officers who approached Morris' apartment to investigate the anonymous tip about the methamphetamine lab saw Beckstead leave that apartment, and because officers found Beckstead's driver's license in the apartment. In addition, there was evidence that Beckstead's co-defendant James told officers that Beckstead had brought the methamphetamine lab to Morris' apartment the previous night, and James referred to Beckstead as Morris' boyfriend. That evidence is insufficient for Beckstead to establish that the officers' search of Morris' apartment implicated Beckstead's Fourth Amendment rights. At most, this evidence established only that Beckstead had previously been to Morris' apartment. But

17

there is no indication he was living there or had spent an occasional night there. Cf. Trask v. Franco, 446 F.3d 1036, 1042 (10th Cir. 2006) (holding individuals who were living in residence when a nonconsensual search occurred had reasonable expectation of privacy there); United States v. Thomas, 372 F.3d 1173, 1176 & n.1 (10th Cir. 2004) (noting that overnight guests and even social guests who do stay overnight have reasonable expectation of privacy, but a person present at another's home to conduct a business transaction does not have a reasonable expectation of privacy), modified on other grounds by United States v. Najar, 451 F.3d 710, 717-18 (10th Cir.), cert. denied, 127 S. Ct. 542 (2006). Even Beckstead's leaving the methamphetamine lab there is insufficient to establish that he had a subjective expectation of privacy in Morris' apartment, let alone an expectation that society is prepared to recognize as objectively reasonable. See United States v. Zermeno, 66 F.3d 1058, 1061 (9th Cir. 1995) (holding that "mere fact that [the defendant] stored contraband at the . . . residence is insufficient to establish that he had a legitimate expectation of privacy there"). Therefore, the district court did not err in denying Beckstead's suppression motion.[8]

---

[8]In his appellate reply brief, Beckstead asserts, without any record citation, that evidence presented at trial established that he had a reasonable expectation of privacy in Morris' apartment. Because Beckstead renewed his motion to suppress at trial, we will also consider trial evidence in ruling on the propriety of the district court's decision denying Beckstead's pretrial motion to suppress. See United States v. Parra, 2 F.3d 1058, 1065 (10th Cir. 1993); see also United States

(continued...)

18

## 2.    Search of Beckstead's car

Beckstead also asserts that officers violated the Fourth Amendment when they searched his car, found in the parking lot outside Morris' apartment, without a warrant. In his opening brief, Beckstead only mentions the car search in two

_____

[8](...continued)

v. Humphrey, 208 F.3d 1190, 1203 (10th Cir. 2000). Here, however, the evidence presented at trial concerning Beckstead's reasonable expectation of privacy in Morris' apartment was conflicting. James testified that Morris and Beckstead were dating at the time of the search, and that Beckstead was then living at the apartment. See United States v. Higgins, 282 F.3d 1261, 1270-71 (10th Cir. 2002) (considering defendant's expectation of privacy at the time the search occurred). But Morris testified, to the contrary, that Beckstead had never lived at her apartment, although he had "spent a couple of nights" there when he was dating her. Nevertheless, according to Morris, her romantic relationship with Beckstead had ended in December 2003, while the search at issue here did not occur until February 9, 2004. Beckstead's mother corroborated that Beckstead and Morris were no longer dating, although she did not specify when that relationship ended. In denying Beckstead's renewed motion to suppress, the district court had to reconcile that conflicting testimony. Because there was evidence presented at trial that supported the district court's previous factual finding that Beckstead lacked standing to challenge the search of Morris' apartment, the district court did not err in denying either motion to suppress. See United States v. Cooper, 733 F.2d 1360, 1364-65 (10th Cir. 1984); see also Jones, 213 F.3d at 1259.

The evidence at trial was further conflicting as to whether Beckstead was present in Morris' apartment the night before the search. Morris testified that she did not see Beckstead in her apartment that night. But James testified instead that Beckstead was at the apartment the night preceding the search, "cooking" methamphetamine. Even if the district court found, as the jury did, that Beckstead had been present in Morris' apartment "cooking" methamphetamine the night preceding the search, that alone would not have established that Beckstead had a legitimate expectation of privacy in Morris' apartment. Cf. Minnesota v. Carter, 525 U.S. 83, 85, 88-91 (1998) (holding individual present in another's home only to conduct business transaction, including one involving illicit drugs, had no legitimate expectation of privacy in the home).

19

section headings, a single sentence in the brief's summary, and two phrases in arguments otherwise challenging the search of Morris' apartment. He makes no specific argument challenging the car search anywhere in the body of his opening brief. Nor does he assert any law in support of a Fourth Amendment challenge to the car search. "It is insufficient merely to state in one's brief that one is appealing an adverse ruling below without advancing reasoned argument as to the grounds for appeal." Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1547 (10th Cir. 1995). Because Beckstead failed to brief this issue adequately in his opening brief, he has waived it. See Stump, 211 F.3d at 533; Gross, 53 F.3d at 1547.

Even if we addressed the merits of his Fourth Amendment challenge to the search of his car, however, that argument does not warrant relief. The district court upheld this search under the "automobile exception" to the Fourth Amendment's warrant requirement. Under that exception, officers possessing probable cause to believe a car contains contraband may search the car without first obtaining a search warrant. See United States v. Brooks, 438 F.3d 1231, 1241 (10th Cir. 2006) (citing, e.g., California v. Carney, 471 U.S. 386, 392 (1985)). "The rationale for the automobile exception is based on both the inherent mobility of cars (as it is often impracticable to obtain a warrant before a car can be driven away) and the fact that there is a reduced expectation of privacy with motor vehicles." United States v. Mercado, 307 F.3d 1226, 1228 (10th Cir. 2002).

20

In this case, when the officers looked into Beckstead's car, they saw glassware which could be used to manufacture methamphetamine. Further, the officers had just discovered a methamphetamine lab in a nearby apartment, after receiving an anonymous tip. That anonymous tip had also included additional information indicating that there was a black Pontiac matching the description of Beckstead's car that was involved with the lab. And when officers first approached the apartment, Beckstead's car had been parked in front of the apartment where officers found the lab. All of these facts were sufficient to give officers probable cause to believe there was contraband in Beckstead's car. See United States v. Ledesma, 447 F.3d 1307, 1319 (10th Cir. 2006) (considering totality of circumstances to determine officers had probable cause to search under automobile exception). Their warrantless search of Beckstead's car, therefore, did not violate the Fourth Amendment.

Beckstead asserts that, under the circumstances of this case, officers had time to obtain a warrant before searching the car because it was parked when they discovered it. But that fact is of no moment:

> Although the automobile exception is based in part on exigency, 'the justification to conduct such a warrantless search does not vanish once the car has been immobilized; nor does it depend upon a reviewing court's assessment of the likelihood in each particular case that the car would have been driven away, or that its contents would have been tampered with, during the period required for the police to obtain a warrant.'

United States v. Ludwig, 10 F.3d 1523, 1528 (10th Cir. 1993) (quoting Michigan

21

v. Thomas, 458 U.S. 259, 261 (1982) (per curiam)). Therefore, the district court did not err in denying Beckstead's motion to suppress the evidence discovered in his car.

### C.    Expert testimony

Beckstead next challenges Officer Daniels' testimony concerning his involvement in the weighing of three packages of red phosphorus found in a safe in Morris' apartment. He specifically asserts that admitting this testimony, which Beckstead argues was hearsay, violated the Confrontation Clause and several rules of evidence, as well as depriving him of due process.

Generally, this court reviews a district court's decision to admit evidence for an abuse of discretion. See United States v. Mares, 441 F.3d 1152, 1154 (10th Cir. 2006), cert. denied, 127 S. Ct. 3048 (2007). "[A]nd our review of decisions to admit evidence over hearsay objections is especially deferential." United States v. Dazey, 403 F.3d 1147, 1165-66 (10th Cir. 2005).

On direct examination, Daniels testified that he weighed the three packages of red phosphorus. On cross-examination, however, Daniels testified that he was unsure whether he or another officer had physically removed those packages from the apartment. In response to defense counsel's question as to which officer weighed the packages, Daniels testified that "It was either myself or Jason Richman. We were the only ones that would be gloved up and suited up and able to touch those." Defense counsel objected:

22

> [O]n cross-examination the officer just indicated that he isn't sure if he weighed the objects found in the safe or not, or whether someone else weighed the objects found in the safe or not, and he is not sure if he is the one who weighed it and looked at the scales and saw the results. Based on that, Your Honor, I would suggest that the evidence is not competent evidence, that it is simply hearsay that the packages weighed what Exhibit 5 [which listed the evidence officers seized at the crime scene] says they weighed, and I would move to strike his testimony as to weight and move to redact that portion of Exhibit 5.

The court reserved its ruling on that objection.

On redirect-examination the following day, Daniels clarified his testimony by stating that he was part of the weighing process and he was able to see the weights registered on the scale when they were weighed. And it was that information that was recorded on Government's Exhibit 5.

On recross-examination, Daniels further explained that, while he did not recall whether it was him or another officer that physically carried the three packages to the table to be weighed, once the packages were at the table, "me and him are the ones that do the weighing and sampling and nobody else." Daniels further indicated that he could not "tell you who set [each package] on the scale. I can tell you that I saw the weights on the scale. I can't tell you who said to the person, it weighs this much, but we both stand there and we both weigh them and we both sample them. I was there during the process when they were weighed."

Beckstead argues that, even if Daniels "was present and saw the weight measurement," "[t]here is still such ambiguity regarding the phosphorus, where it came from, how it got on the scale, how it was measured, and whether the weight

included packaging, that the testimony of the weight taken in this makeshift destruction facility is simply not competent." We disagree. Daniels eventually clarified any confusion. The district court, therefore, did not abuse its discretion in refusing to strike this testimony.

**D.    Imposition of statutory mandatory minimum twenty-year sentence.**

Beckstead argues that the district court's imposition of the statutory mandatory minimum twenty-year sentence violated United States v. Booker, 543 U.S. 220 (2005). Because Beckstead objected to the mandatory minimum sentence in the district court, we review it de novo. See United States v. Bustamante, 454 F.3d 1200, 1202 (10th Cir. 2006). This court has previously held that "Booker . . . does not apply to statutory minimum sentences." United States v. Harris, 447 F.3d 1300, 1307 (10th Cir. 2006); see also United States v. Ramirez, 479 F.3d 1229, 1255 (10th Cir. 2007). Beckstead acknowledges this authority and seeks only to preserve this issue for further appeal.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Beckstead's convictions and sentence.