**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 20, 2010**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

MITCHELL JAMES PETHICK,

      Defendant - Appellant.

No. 09-1319

(D. Colorado)

(D.C. No. 08-CR-00023-REB-1)

---

**ORDER AND JUDGMENT**[*]

---

Before **TACHA**, **ANDERSON**, and **BRISCOE**, Circuit Judges.

---

Defendant and appellant Mitchell James Pethick was charged with one count of driving under the influence on the United States Military Reservation at Fort Carson, Colorado, in violation of Colo. Rev. Stat. § 42-4-1301(1)(a), applicable to him through 18 U.S.C. § 13.[1]  After a jury found him guilty,

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]Section 13 of the Assimilative Crimes Act ("ACA") (18 U.S.C. § 13) was enacted to fill gaps in the criminal laws otherwise applicable to federal enclaves by incorporating state law.  See United States v. Adams, 140 F.3d 895, 896 (10th Cir. 1998).  The Act provides "a method of punishing a crime committed on government reservations in the way and to the extent that it would have been

Mr. Pethick was sentenced to fifteen days' imprisonment and a fine of $300, as well as one year of supervised release and a special assessment of $25. This appeal followed.[2]

## BACKGROUND

The following facts are largely derived from the district court's opinion. Mr. Pethick does not challenge the accuracy of the district court's recitation of the facts, and these facts comport with our own review of the record.

Mr. Pethick and three friends spent a few hours late in the evening of February 10, 2006, drinking at a local bar in Colorado Springs, Colorado. In the early hours of the following morning (February 11), Mr. Pethick and his friends decided to go to the store located at the nearby Fort Carson Army Post to purchase more alcohol. They accordingly drove to entrance Gate 20, arriving around 2:30 a.m. Pursuant to government policy, a military guard stopped the vehicle and spoke to Mr. Pethick, who was driving, and his friends. Also pursuant to government policy, the Gate is subject to constant camera surveillance and recording. Furthermore, at the approach to the Gate, there is a large sign which states in pertinent part:

punishable if committed within the surrounding jurisdiction." Id. (quoting United States v. Garcia, 893 F.2d 250, 253 (10th Cir. 1989)).

[2] A prior appeal to this court was dismissed without prejudice, for lack of jurisdiction. United States v. Pethick, 513 F.3d 1200 (10th Cir. 2008).

ENTRY IMPLIES:

CONSENT TO BREATH/BLOOD ALCOHOL TEST

CONSENT TO SEARCH UPON REQUEST

Mr. Pethick and his companions gave their identification cards to the guard, who asked all of them to get out of the car. Mr. Pethick admitted that he had consumed alcohol and stated that the purpose of his visit was to patronize the store on the base to purchase more. Mr. Pethick was apparently vociferous, bellicose and generally uncooperative in his dealings with the guard, who then called for assistance. The guard escorted Mr. Pethick to a kiosk away from the Gate 20 area, and he was accordingly out of view of the surveillance camera for the duration of the encounter that night.

A specialist officer who arrived in response to the guard's call, Neysa Adell Wright, found Mr. Pethick uncooperative. She, in turn, called in a military police officer ("MP"), who had received training in traffic issues, including the administration of field sobriety tests.[3] The MP asked Mr. Pethick to navigate a straight line and a pin turn while walking heel-to-toe and to extend and flex his arms to touch his nose with his fingertips. While administering the tests, the MP observed that Mr. Pethick smelled of alcohol, that his eyes were watery and bloodshot, and that he spoke incoherently and with slurred speech. The MP and

---

[3]The MP testified that he had made approximately thirty stops and arrests for driving under the influence of alcohol.

-3-

the specialist officer both noticed that, when he performed the walk-and-turn test, Mr. Pethick failed to follow instructions and was unable to maintain his balance. Both officers also observed that while performing the finger-to-nose test, Mr. Pethick swayed, almost falling backwards at one point, and was unable to touch his nose. Based on his observations, the MP placed Mr. Pethick under arrest and informed him that he would be required to submit to breath or blood testing. Subsequent testing revealed that Mr. Pethick had a blood alcohol content of .162.

Mr. Pethick initially received a "violation notice" for a Class A misdemeanor. In accordance with the ususal procedures for such notices, the violation notice was processed routinely through the Central Violations Bureau ("CVB") in Texas, and approximately fifty-three days elapsed before Mr. Pethick first appeared in federal court to respond to the charge of driving under the influence, in violation of Colorado law and the ACA. At that time, fifty-three days after the incident leading to the charge, the government finally filed an information pressing that charge. The government concedes it was error to simply file a violation notice, with the result that nothing happened for fifty-three days. Because it was standard practice to re-use videotapes and record over existing footage every two weeks, the videotape of the particular encounter with Mr. Pethick at Gate 20 on February 11 was unavailable at the time Mr. Pethick was charged. Mr. Pethick argues that the government was well aware of this

-4-

problem of the videotapes "disappearing" before a defendant can make use of them at trial, having received requests for the preservation of similar videotapes in prior cases.

Following a two-day trial, Mr. Pethick was convicted and sentenced by the magistrate judge. The district court affirmed that conviction and sentence. This appeal follows from the district court's decision affirming the magistrate judge.[4]

**DISCUSSION**

Mr. Pethick asks us to vacate his conviction and dismiss this case with prejudice, arguing three issues: (1) the government's "misuse of the central violation notice procedure in disregard of Fed. R. Crim. P. 5, coupled with the government's continued practice of intentional destruction of evidence prior to Pethick's ability to get to court, prevented Pethick from presenting a defense at trial[,] in violation of the due process clause of the Fifth Amendment" and the Sixth Amendment right to a Speedy Trial; (2) the district court "erred by failing to find a Brady violation or a violation of the due process clause of the Fifth

---

[4]This case comes to us in an unusual procedural posture. Technically, this is an appeal from the district court's review of an appeal from a magistrate judge's decision imposing a criminal sentence. This "derives from the fact that Senior U.S. District Judge Daniel Sparr, who presided over the jury trial, died prior to sentencing. [Mr. Pethick] subsequently consented to the jurisdiction of the magistrate judge, who presided over sentencing and entered judgment against [Mr. Pethick]." Order at 2 n.2, R. Vol. 2 at 500. The district court had jurisdiction over the appeal from the conviction by the magistrate judge, pursuant to 18 U.S.C. § 3402.

Amendment based upon failure of the government after notice in prior cases to preserve surveillance evidence occurring during time of contact with Pethick"; and (3) the district court erred in finding that law enforcement officers had "sufficient probable cause to believe Pethick was driving a vehicle in violation of the DUI laws so that [they] could thereby require Pethick to submit to testing of his blood." Appellant's Op. Br. at ii-iii.

We note that the district court rejected all of these arguments by Mr. Pethick in the course of its decision affirming the magistrate judge's entry of judgment and imposition of sentence.

### I. Due Process/Speedy Trial Claims:

Mr. Pethick argues that the procedure used in charging him (i.e., he was first charged with a notice violation and only later by information alleging the same charge, which resulted in the unavailability of the videotapes) violated his rights under the due process clause of the Fifth Amendment and his Sixth Amendment right to a speedy trial. More specifically, he alleges that the fifty-three-day delay between the initial charge and his appearance in federal court violated his right to a speedy trial, and deprived him of the opportunity to request (and possibly ensure) the preservation of the videotapes and to seek early advice from an attorney.

"We review . . . [a] due process claim de novo." N-A-M v. Holder, 587 F.3d 1052, 1055 (10th Cir. 2009). Additionally, we review de novo a claimed deprivation of a speedy trial. United States v. Toombs, 574 F.3d 1262, 1268 (10th Cir. 2009).

"To establish that the Government deprived him of due process by destroying potentially exculpatory evidence, [Mr. Pethick] must show both that 1) the evidence destroyed was potentially exculpatory and 2) the government acted in bad faith in destroying it." United States v. Beckstead, 500 F.3d 1154, 1158 (10th Cir. 2007). For the reasons stated in its decision, we agree with the district court that, even assuming some exculpatory element to the videotapes, Mr. Pethick cannot demonstrate that the government acted in bad faith. And, to the extent Mr. Pethick argues that the destruction of the videotapes impeded his Sixth Amendment right to present an effective defense, we reject that argument. As explained more fully, *infra*, the videotapes did not capture the conduct of the field sobriety tests, and therefore would have provided only partial information about Mr. Pethick's condition. Furthermore, nothing prevented Mr. Pethick from having witnesses who accompanied him that night provide eyewitness accounts of what transpired.

With respect to Mr. Pethick's right to a speedy trial, an assessment of that right normally requires the consideration of the four-factor test set out in, *inter alia*, United States v. Abdush-Shakur, 465 F.3d 458, 464 (10th Cir. 2006) (citing

-7-

<u>Barker v. Wingo</u>, 407 U.S. 514, 530 (1972)).  We agree with the district court that the speedy trial clock begins to run only from the date of the filing of an information, indictment, or complaint, not from the issuance of a "ticket" or "notice violation" as Mr. Pethick initially received in this case.  Thus, Mr. Pethick cannot construct a speedy trial violation out of the fifty-three days between the issuance of the ticket to him and the filing of the information against him.

We accordingly reject these arguments, for substantially the reasons stated in the district court's thorough opinion dated July 15, 2009, as supplemented by our remarks above.

## II.  <u>Brady</u> Violation Claim:

Mr. Pethick argues that the government's destruction of the videotape evidence also violates <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  "The prosecution's suppression of evidence favorable to the accused . . . violates due process where the evidence is material either to guilt or to punishment."  <u>United States v. Williams</u>, 576 F.3d 1149, 1163 (10th Cir. 2009).  "To establish a <u>Brady</u> violation, the defendant must prove that the prosecution suppressed evidence, the evidence was favorable to the defense and the evidence was material."  <u>Id.</u> Evidence is material for <u>Brady</u> purposes "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding

would have been different." Id.; see also United States v. Velarde, 485 F.3d 553, 559 (10th Cir. 2007). A reasonable probability, in turn, is a "probability sufficient to undermine confidence in the outcome." Williams, 576 F.3d at 1163.

We agree with the district court that Mr. Pethick has failed to sustain his burden to establish by a preponderance of the evidence that the videotape is either favorable to him or material to the verdict. As the court explicitly noted:

> Although it is reasonable to assume, given the placement of the cameras, that the videotape would have captured [Mr.Pethick] driving, stopping, and exiting the vehicle, it is undisputed that the cameras would not have captured [Mr. Pethick's] performance of the field sobriety tests. Moreover, [Mr. Pethick] was not stopped because he was driving erratically but rather simply because it was standard procedure to stop *all* cars attempting to enter the base through gate 20. I, therefore, find it difficult to discern how video of [Mr. Pethick] driving through the gate or exiting his vehicle would be exculpatory when the totality of the other circumstances observed by officers clearly established probable cause.

Order at 7-8 n.10, R. Vol. 2 at 505-06 n.10. Thus, we perceive no Brady violation.

### III. Probable Cause:

Finally, Mr. Pethick argues that the district court erred in finding that the law enforcement personnel at Fort Carson's Gate 20 had sufficient probable cause to believe that he was driving under the influence. "[T]he ultimate determination of . . . probable cause is a mixed question of law and fact that we review de novo." United States v. Hauk, 412 F.3d 1179, 1185 (10th Cir. 2005). While

Mr. Pethick devotes many pages of his briefs to technical aspects of field sobriety tests and the conduct of such tests, the crux of his argument is that they were simply administered incorrectly and not in precise conformity with certain manuals. He argues that they are, therefore, insufficient to establish probable cause to arrest him and perform further blood testing.[5] We reject this argument, for substantially the reasons set forth in the district court's decision.

## CONCLUSION

In sum, we agree with the district court's decision and analysis in affirming the conviction and sentence imposed by the magistrate judge. Accordingly, for

---

[5]The district court described Mr. Pethick's more particular complaints as follows:

> (1) that the MP's instructions as to how to perform the walk-and-turn test did not track the standard instruction for the test set forth by the National Highway Traffic Safety Administration ("NHTSA"), because, *inter alia*, the MP did not instruct [Mr. Pethick] to take the NHTSA-proposed number and type of footsteps in performing the turn and did not advise him of the NHTSA-proposed allowable space between one's heel and toe or between one's arms and sides while walking; (2) that the MP did not administer two NHTSA-recommended sobriety tests, specifically, the one-leg stand and the horizontal gaze nystagmus tests; (3) that the nose-touch test was not in keeping with Fort Carson's standard practices; and (4) that the MP only partially completed an alcohol incident report form, which set forth a standardized formula to analyze probable cause.

Order at 5, R. Vol. 2 at 503.

substantially the reasons stated therein, the decision of the district court is

AFFIRMED.

                                        ENTERED FOR THE COURT


                                        Stephen H. Anderson
                                        Circuit Judge