**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 30 2004**

**PATRICK FISHER**
**Clerk**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

DAVID CHRISTOPHER WILLIAMS,
also known as "Frenchie,"

      Defendant-Appellant.

No. 02-2084

---

**Appeal from the United States District Court**
**for the District of New Mexico**
**(D.C. No. CR-97-607-LH)**

---

David N. Williams, Assistant United States Attorney, (David C. Iglesias, United States Attorney, with him on the briefs), Albuquerque, New Mexico, for Plaintiff-Appellee.

Phillip P. Medrano, Assistant Federal Public Defender, Albuquerque, New Mexico, for Defendant-Appellant.

---

Before **LUCERO, O'BRIEN** and **TYMKOVICH**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

David Williams, the subject of a reverse sting operation by United States

Drug Enforcement Administration (DEA) agents in Las Cruces, New Mexico, was convicted of Attempt to Possess With Intent to Distribute More than 100 Kilograms of Marijuana in violation of 21 U.S.C. § 841(b)(1)(B), and Conspiracy to Possess with Intent to Distribute More than 100 Kilograms of Marijuana in violation of 21 U.S.C. § 841(b)(1)(B), 21 U.S.C. § 846 and 18 U.S.C. § 2. He was sentenced to 235 months imprisonment on each count, to run concurrently, and eight years supervised release. Williams appeals his conviction and sentence. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, remand for rulings on disputed factual issues affecting the sentence and, if necessary, resentencing.

**BACKGROUND**

In the early summer months of 1997, undercover DEA Agent Luis Medina, was introduced over the telephone to Williams – a.k.a. "Frenchie" – through a confidential informant named "George." Agent Medina portrayed himself as a large-scale marijuana distributor operating out of Las Cruces, New Mexico, looking for a purchaser.[1] Williams indicated he could resell the product through his operation in New York. Agent Medina and Williams communicated extensively by telephone and engaged in approximately thirty to forty

---

[1] This practice is commonly known as a reverse undercover operation or reverse sting.

conversations over the course of the summer.[2] The conversations included discussions regarding the purchase and sale of quantities of marijuana ranging from 100 pounds up to 2,500 pounds at a price of $200 per pound.[3] Williams indicated that once the marijuana was taken to New York he could sell it for $500 to $600 per pound. He also stated he could sell about 1,000 pounds per week once he got "warmed up."

During these conversations, Williams repeatedly asked Agent Medina to travel to New York and meet with him to see how he operated. Agent Medina declined and indicated he would rather Williams travel to Las Cruces. Williams said he would, or he would send someone to meet with Agent Medina.

On August 27, 1997, after several failed plans to meet, Williams told Agent Medina one of his associates would call. Minutes later, Agent Medina received a call from a man identifying himself as "Mark,"[4] who said he was associated with "Frenchie" and wanted to meet. They arranged a meeting for the next day. After picking up Mark at his hotel in El Paso, Agent Medina drove to a roadside park in New Mexico. En route to the park, Mark told Agent Medina he was there to

---

[2] A number of these telephone conversations were recorded, and fourteen of them were played to and transcribed for the jury. (R., Supp. Vol. III.)

[3] The price of $200.00 was for marijuana transferred in Las Cruces. The negotiated price per pound increased an additional $25.00 to $80.00 per pound if Agent Medina had to arrange delivery to another location.

[4] "Mark" is the alias used by Williams' co-defendant, Eric Derrick Holliday.

ensure everything was ready for the sale. He reported that Williams indicated the deal was for 1,000 pounds of marijuana at $200 per pound.

Once at the park, Agent Medina showed him a thirty pound bundle of marijuana. After his inspection, Mark said it looked good and that he would relay his impression to Williams. The two continued to discuss possible deals. Eventually, Agent Medina wrote down a quantity and price for marijuana on the back of a business card.[5] The first entry provided 1,000 pounds of marijuana at $250,000 ($200 per pound and $50 per pound for transportation) for which Agent Medina requested payment prior to delivery. The second entry indicated Agent Medina would front 1,500 pounds of marijuana to Williams for a total of 2,500 pounds. Mark informed Agent Medina that Williams had the money, this was a good deal, and he did not know why Williams was delaying completion of the transaction.

After this meeting, Williams called Agent Medina and told him he had talked with Mark who said "everything looks good." (R., Vol. III, Ex. 13A.) Williams stated he would meet with Agent Medina in Las Cruces the next weekend, but when pressed for a more definite commitment regarding the specific quantity Williams was willing to buy, Williams said he wanted to take it "one step

---

[5] When Mark was later arrested, the business card with these notations were found in his wallet.

at a time" so he would "know what moves to make" when he arrived in Las Cruces. (*Id.* at 2.) He did not travel to Las Cruces that weekend and later apologized for not showing up, claiming his attention was diverted by a newly-arrived load of marijuana.

After several more telephone conversations, Williams finally arrived in El Paso, Texas on September 17, 1997, with three business associates, including Mark. At Williams' hotel bar, he informed Agent Medina that he wanted to purchase 100 pounds of marijuana immediately to send to New York on a commercial airline. He would then use the proceeds from the sale (estimated at $60,000) for purchase of an additional 300 pounds. Agent Medina also offered to front Williams an additional 200 pounds, but told Williams he wanted him to provide some money as a demonstration of his sincerity. In response, Williams pulled two rolls of bills from his pockets, which he indicated was approximately $10,000.00. Agent Medina then took Williams to the parking lot, showed him a sample of the marijuana and told Williams it would be delivered the next day but he needed a down payment of $5,000. Williams gave Agent Medina the down payment.

The following day, Williams called Agent Medina from El Paso saying he was ready to complete the transaction but had no transportation to Las Cruces. Agent Medina sent George to get him. When George arrived, Williams said he

changed his mind and wanted to conduct the transaction in El Paso. When Williams would not let George out of the hotel room, George called Agent Medina to report the situation. Agent Medina spoke with Williams and convinced him to go with George and finish the deal in Las Cruces. Concerned for George's safety, Agent Medina kept in telephone contact during the drive to Las Cruces. On the way, George reported Williams had commandeered the vehicle and was driving away from Las Cruces. Again Agent Medina told Williams the transaction needed to occur in Las Cruces, but because it did not appear the deal would be completed, he would refund Williams' $5,000. Eventually, these negotiations resulted in Williams allowing George to drive to Las Cruces. In a surprise move, however, the car pulled into a parking lot across the street from the transaction's designated location. After Williams and one of his companions exited, George drove across the street where Agent Medina waited. Law enforcement officials arrested the car's occupants. Witnessing the arrests from across the street, Williams and his companion ran from the scene. He was found a short time later hiding in a nearby hotel.

**PROCEDURAL BACKGROUND**

On January 7, 1997, Williams pled guilty to a two-count indictment charging him with attempted possession and conspiracy to possess a controlled substance with the intent to distribute. After agreeing to assist the DEA in further

investigations, Williams filed an unopposed motion for release. Granting the motion, the district court imposed specific conditions, including: (1) restricting Williams' travel to the county of his residence in New Jersey, with the only exception being travel to New Mexico for court appearances; and (2) requiring him to contact his attorney on a regular basis, appear at all proceedings as required, and surrender for service of any sentence imposed. On April 6, 1998, Williams failed to appear for sentencing and an arrest warrant was issued. He also failed to maintain contact with his attorney and eventually left the country without permission—traveling to Jamaica, London, and back to the United States. He was arrested in Michigan on November 21, 2000, for a misdemeanor. After checking his records, Michigan law enforcement returned him to New Mexico.

Prior to fleeing, Williams cooperated with government agents and testified for the United States in the Southern District of Texas. He also participated in undercover operations in New York. He claims his cooperation resulted in threats upon his life which forced him to flee, but even while absent from the country he provided assistance and information to the United States. Prior to sentencing, when Williams learned the United States would not move for a downward departure for substantial assistance, he filed a motion to withdraw his guilty plea.[6]

---

[6] The plea agreement between the United States and Williams stated that if Williams provided certain assistance to the government, the government **may** in turn move for a downward departure for substantial assistance under USSG §5K1.1. The

At the motion hearing, the district court judge opined the government's refusal to file a motion for a downward departure was "unduly hard" on Williams. (*Id.* at 10,16.) The court granted Williams' motion to withdraw the guilty plea and the matter proceeded to trial.

The jury found Williams guilty of the original charges. The presentence investigative report (PSIR) recommended he be sentenced at a base offense level of 32 because the offense "involved negotiations for 2,500 pounds of marijuana." USSG §2D1.1(a)(3) (2000). It also provided a two level obstruction of justice enhancement for absconding. *See* USSG §3C1.1. Williams objected to both recommendations and sought a downward departure based upon substantial assistance. The district court rejected Williams' arguments and adopted the PSIR's factual findings and conclusions.

Williams raises four issues on appeal. He contends the district court erred by: 1) finding the "agreed upon" quantity of marijuana was 2,500 pounds; 2) enhancing his sentence for obstruction of justice under USSG §3C1.1 (2000); 3) failing to make a downward departure for substantial assistance; and, 4) failing to instruct the jury on his proffered affirmative defense—withdrawal from a conspiracy.

_____

agreement specifically stated that any request for a downward departure was within the sole discretion of the United States Attorney for the District of New Mexico.

## 1. *Quantity of Marijuana*

"In an offense involving an agreement to sell a controlled substance, the agreed upon quantity of the controlled substance shall be used to determine the offense level unless the sale is completed and the amount delivered more accurately reflects the scale of the offense." USSG §2D1.1, comment. (n12). The PSIR computed the "agreed upon" amount of marijuana to be 2,500 pounds. That quantity results in a base-offense level of 32. USSG §2D1.1(a)(3) and (c). Williams objected to this calculation, arguing the negotiated sale involved only 400 to 600 pounds, yielding a base offense level of 26.[7] Adopting the PSIR's factual findings, the district court applied a base offense level of 32. On appeal, Williams claims the district court's determination was clearly erroneous. *See United States v. McCloud*, 127 F.3d 1284, 1290 (10th Cir. 1997) (a sentencing court's determination of the quantity of drugs attributable to a defendant is reviewed for clear error).

In this case, however, we cannot test for clear error because there was no judicial finding. The district court rejected Williams' argument and adopted the

---

[7] In convictions involving a controlled substance, the base offense level is determined by the quantity of drugs involved. The Drug Quantity Table, contained in USSG §2D1.1(c), applies a base offense level of 26 if the amount of marijuana is at least 100 kilograms but less than 400 kilograms. If Williams agreed to a sale of 600 pounds, his conviction falls in this category. However, if the amount of marijuana is at least 1,000 kilograms but less than 3,000 kilograms, the base offense level rises to 32. An agreement for a sale of 2,500 pounds is contained in this category.

quantity in the PSIR simply by stating, "[y]ou can take that up to the Tenth Circuit, see what the evidence supported, okay?" (R., Vol. V at 18.) This is not a judicial determination, particularly in a case where the evidence is in equipoise and the parties are deeply divided.

The district court is required to "resolve disputed sentencing factors at a sentencing hearing in accordance with Rule 32(c)(1), Fed. R. Crim. P."[8] USSG §6A1.3(b). In turn, Rule 32 provides that the district court must make a ruling on disputed portions of the PSIR that affect the sentence. Fed. R. Crim. P. 32(i)(3)(B). The reverse sting operation involved discussions of varying amounts of marijuana; no definitive agreement was established. The amounts varied from 2,500 pounds, indicated on the business card given to Mark, to 1,000 pounds discussed throughout the sting operation, to 600 pounds discussed at the hotel bar. Additional amounts of 2,000 pounds, 1,500 pounds, 1,600 pounds, and 900 pounds were all discussed in some way during the operation. Because the amount "agreed upon" is a substantial factor in determining the length of the sentence, it is critical that the district court make a clear and undisputed ruling on the issue.

We have often held it is insufficient to merely adopt the factual findings

---

[8]Rule 32 was amended effective December 2002, after the imposition of Williams' sentence. For purposes of this decision, the only relevant difference is that 32(c)(1) used the word "finding" and 32(i)(3)(B) uses "rule/ruling." The semantics are of no import here because the district court failed to make either a ruling or a finding.

and guideline applications of the PSIR.  *United States v. Guzman*, 318 F.3d 1191, 1198 (10th Cir. 2003) (a district court may not satisfy its obligations under USSG §6A1.3(b) "by simply adopting the presentence report as its finding."); *United States v. Farnsworth*, 92 F.3d 1001, 1011 (10th Cir. 1996) (same).[9]  Additionally, we need to insure that the burden of persuasion establishing the amount "agreed upon" was not inadvertently shifted to the defendant.  *United States v. Kirk*, 894 F.2d 1162, 1164 (10th Cir. 1990) ("[t]he government shall bear the burden of proof for sentence increases and the defendant shall bear the burden of proof for sentence decreases.").  Since the amount of marijuana at issue may have been premised on a legal error and, alternatively, because the record contains no clear and independent ruling by the district court on a critical disputed fact, we reverse and remand for resentencing.

## 2.     *Obstruction of Justice – USSG §3C1.1*

Williams objected to the PSIR's two-point enhancement for obstruction of justice based on his absconding prior to sentencing.  He claims he did not abscond, rather he was forced to leave the country after receiving death threats caused by his assistance to the government.  Moreover, he claims he volunteered

---

[9] It may be necessary in some instances for the sentencing court to conduct a hearing to resolve disputed factual issues.  But when resolution merely involves trial facts to which the district court was privy, an additional hearing would be superfluous.  A ruling on a disputed issue need not be exhaustively detailed, but it must be definite and clear.

"assistance" to the United States while out of the country, conduct inconsistent with obstruction of justice. He also contends such assistance entitles him to a downward departure. The district court rejected this argument, noting the evidence of his failure to cooperate and his actual flight from the United States.

We review the district court's interpretation of the United States Sentencing Guidelines *de novo*. *United States v. Hawley*, 93 F.3d 682, 686-87 (10th Cir. 1996). Under USSG §3C1.1, a two-point enhancement is appropriate when "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction . . . ." Obstruction of justice includes "escaping or attempting to escape from custody before trial or sentencing," or "willfully failing to appear, as ordered, for a judicial proceeding." USSG §3C1.1, comment. (n.4(e)).

By definition "abscond" means "to leave hastily and secretly, especially to escape the law." WEBSTER'S NEW WORLD DICTIONARY (Rev. Ed. 2003). While on conditional release Williams left the United States without permission and failed to appear for sentencing. Notably, upon his return to the United States he did not report to the proper authorities. Instead, he was arrested in Michigan and returned to New Mexico. Notwithstanding his *post hoc* rationalizations, Williams absconded and his conduct amounted to an obstruction of justice. To hold

otherwise would condone direct disobedience of a court's conditional release order. A two-point enhancement under USSG §3C1.1 was appropriate.

### 3. *Denial of Downward Departure*

After Williams' arrest and return to New Mexico, he learned the United States would not move for a downward departure for substantial assistance. As a result, he successfully moved to withdraw his guilty plea, went to trial and was found guilty on the original charges. At sentencing, Williams moved for a downward departure claiming he had provided substantial assistance to the United States both before fleeing and while out of the country. The district court again noted the testimony at trial indicating he did not fully cooperate. That, coupled with the fact he absconded, prompted the district court to deny his motion.

On appeal, Williams raises a multi-tiered argument regarding the denial of a downward departure. First, he claims the government breached its plea agreement by not filing a motion for downward departure based on his substantial assistance. This argument is without substance, as there was no longer a plea agreement in existence at sentencing. Williams cannot claim the benefits of an agreement terminated upon his request. Nonetheless, he argues the agreement should be enforced because the government's initial breach of its terms forced him to withdraw his plea.

We review whether the government breached an agreement *de novo*.

*United States v. Werner*, 317 F.3d 1168, 1169 (10th Cir.), *cert. denied*, 124 S. Ct. 74 (2003); *Guzman*, 318 F.3d at 1195. Williams' argument fails for two reasons. First, the agreement specifically left the decision whether or not to file a motion for a downward departure to the sole discretion of the United States Attorney for the District of New Mexico. Aside from the discretionary nature of the bargain, Williams' conduct belies his claim. If he believed the government violated the agreement, he could have sought to enforce it, just as he does now. Withdrawing a guilty plea and going to trial is not a predicate to the enforcement of a plea agreement.

Williams' second argument asserts the district court should have granted his motion for downward departure for substantial assistance without regard to the government's position. We doubt his ability to bring such a motion. "As a general rule, a district court's authority to consider a defendant's substantial assistance claim at sentencing is conditioned upon a prior motion of the government." *United States v. Duncan*, 242 F.3d 940, 944 (10th Cir. 2001) (citing 18 U.S.C. § 3553(e); USSG §5K1.1). Moreover, bringing such motion is a power—not a duty. *Id*. at 946. Yet, even if Williams were able to seek a downward departure, the district court properly denied this request for the same reasons stated above: his flight while on conditional release, his failure to appear at sentencing, and his unilateral decision to provide "assistance" on his own

terms.

The district court can review the government's refusal to file a substantial assistance motion, but review "is limited to determining whether the decision was: (1) animated by an unconstitutional motive, or (2) not rationally related to a legitimate government end." *Id*. at 947. Williams contends the government's refusal was not rationally related to a legitimate government end. We disagree.

It is both rational and legitimate to expect those on conditional release to abide by the terms of that release. Similarly, the government may legitimately direct the assistance it expects from defendants, rather than defer to the defendant's agenda. Further, it is rational for the government to evaluate the worth of the defendant's cooperation when charting its course. Finally, we cannot gainsay the government's ability to reward unhesitating and complete cooperation and ignore that which is incomplete, insincere or manipulative. The district court did not err.

### 4. *Denial of Proffered Jury Instruction–Withdrawal From a Conspiracy*

Williams requested a jury instruction on the affirmative defense of withdrawal from a conspiracy. Relying on *United States v. Gonzalez*, 797 F.2d 915 (10th Cir. 1986), the district court held that if a conspiracy existed, it was completed with an overt act which occurred once Williams arrived in Las Cruces and provided a $5,000 down payment. Because Williams could not subsequently

-15-

withdraw from the completed conspiracy, the district court concluded his proffered instruction was not warranted.

Whether the jury should have been instructed on a specific matter is a question of law reviewed *de novo*. *United States v. Scull*, 321 F.3d 1270, 1274 (10th Cir.), *cert. denied,* 124 S. Ct. 175 (2003). Williams claims the jury should have been allowed to decide if he had withdrawn from any marijuana trafficking beyond the first 100 pound delivery. He characterizes the conspiracy as a series of related but discrete acts involving separate amounts of marijuana. He identifies the overt act of handing Agent Medina the down payment for 100 pounds as relating solely to that specific shipment. Reasoning that the additional 300 pounds "was entirely conditioned in this case on the successful delivery [and sale] of the initial 100 pounds," he contends his: 1) refusal to go to Las Cruces; 2) turning away from Las Cruces; 3) seeking the return of his money; and 4) leaving the car before it crossed the street to make the drug transaction, all point to his attempt to withdraw from further dealings with Agent Medina. (R., Vol. VIII, pp. 228-30.) From this, he concludes the jury should have decided as a question of fact whether the affirmative defense of withdrawal exonerated Williams from all but the conspiracy to acquire 100 pounds of marijuana.

While Williams' argument is interesting, it is off the mark. Williams was charged with conspiring to possess and distribute drugs under 21 U.S.C. § 846.

-16-

Drug conspiracies under 21 U.S.C. § 846 are unique because the government need not prove an overt act. *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (citing *United States v. Shabani*, 513 U.S. 10 (1994)). Instead, the government must "prove that the defendant knew at least the essential objectives of the conspiracy and knowingly and voluntarily became a part of it."[10] *Id.*

Because there is no overt act requirement under the drug conspiracy statute, withdrawal cannot relieve a defendant of criminal responsibility for a conspiracy charged under § 846, though withdrawal may limit a defendant's liability in situations not relevant here.[11] *See United States v. Hughes*, 191 F.3d 1317, 1323 (10th Cir. 1999) ("The defense of withdrawal does not exonerate a defendant for past conduct; it can exonerate him only as to future conduct by his coconspirators.") (citations omitted); *United States v. Grimmett*, 150 F.3d 958, 961 (8th Cir. 1998) (there is a "general rule that a defendant may not raise withdrawal as an affirmative defense to a conspiracy charge where no overt act is

---

[10] "A conspiracy in violation of 21 U.S.C. § 846 consists of four elements. The government must prove beyond a reasonable doubt (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *United States v. Dozal*, 173 F.3d 787, 797 (10th Cir. 1999) (quotation marks and citations omitted).

[11] For example, withdrawal does have some limited uses such as insulation from "liability for substantive crimes of others that occur after his withdrawal" or admission of statements by co-conspirators after the defendant withdraws. *Grimmett*, 150 F.3d at 961. It may also normally start the running of the statute of limitations. *Id.*

necessary."); *United States v. Rogers*, 102 F.3d 641, 645 (1st Cir. 1996) (withdrawal does not provide an affirmative defense to § 846 conspiracy); and *United States v. Francis*, 916 F.2d 464, 466 (8th Cir. 1990).[12] Thus, an instruction on the affirmative defense of withdrawal did not apply here.

The critical question is whether the scope of the conspiracy involved more than the 100 pounds negotiated for initial delivery. Clearly, it did. The initial 100 pounds was directly tied to, at least, 300 pounds more. Upon remand, the district court may find that the agreed upon amount was up to 2,500 pounds. Whatever its scope, the conspiracy became complete once Williams knew its essential objectives and knowingly and voluntarily became a part of it. There can be no withdrawal from a conspiracy once it is complete. *See Gonzalez*, 797 F.2d at 916-17. Accordingly, the district court did not err in refusing to instruct the jury on withdrawal as an affirmative defense.

---

[12] Several federal pattern jury instructions also recognize that withdrawal cannot be used as an affirmative defense for a charge under § 846. Williams proposed Pattern Criminal Jury Instruction of the Fifth Circuit § 2.23. This instruction is accompanied by a note stating this affirmative defense is not available "to conspiracies charged under 21 U.S.C. § 846, which do not require proof of an overt act." Pattern Crim. Jury Instr. 5th Cir. § 2.23 (2001). *See also* Pattern Crim. Jury Instr. 11th Circuit, Offense Instruction 13.4 (2003) Annotations and Comments ("an instruction on withdrawal is never appropriate under a conspiracy statute that does not require proof of an overt act"); Federal Jury Practice & Instructions § 63 ("in [this] situation the crime is complete when the defendant joins a conspiracy, [therefore] the concept of withdrawal would appear to be inapplicable . . . .").

**CONCLUSION**

For all of the aforementioned reasons, we AFFIRM the district court's imposition of a two-level sentencing enhancement for obstruction of justice, its denial of a downward departure for substantial assistance and its denial of an affirmative defense instruction on withdrawal from the conspiracy. However, the sentence necessarily depends upon the quantity of marijuana agreed upon in the conspiracy. That determination was not made of record so we must remand for the district court to rule on that issue, clarify the record and, if necessary, re-sentence the defendant. We **AFFIRM** in part, **REVERSE** in part, and **REMAND** for a ruling under USSG §6A1.3(b) and resentencing, if necessary.