**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 23, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

      Plaintiff-Appellee,

v.

TRACY M. SMITH,

      Defendant-Appellant.

No. 07-3061

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 05-CR-40065-RDR)**

Thomas D. Haney, Henson, Clark, Hutton, Mudrick & Gragson, LLP, Topeka, Kansas, for Defendant-Appellant.

Anthony W. Mattivi, Assistant United States Attorney (Eric F. Melgren, United States Attorney and James A. Brown, Assistant United States Attorney, on the brief) Topeka, Kansas, for Plaintiff-Appellee.

Before **HENRY**, Chief Judge, **TACHA**, and **LUCERO**, Circuit Judges.

**HENRY**, Chief Judge.

Tracy Smith was convicted by a jury on seventeen charges related to a drug conspiracy. The district court sentenced her to 324 months' imprisonment. Ms. Smith appeals her conviction and her sentence. Exercising jurisdiction pursuant to

28 U.S.C. § 1291, we affirm both.

## I. BACKGROUND

Ms. Smith was indicted on charges relating to a drug conspiracy she entered with Dennis Torrence during an eighteen-month span, from October 2003 to June 2005. Mr. Torrence pleaded guilty and testified against Ms. Smith.

The investigation of Ms. Smith began with a series of "trash pulls" – or seizures of the garbage from Ms. Smith's home – in the fall of 2003. Over the course of three trash pulls, Shawnee County (Kansas) Sheriff's deputies found plastic baggies with cocaine residue, other drug paraphernalia, and mail addressed to Ms. Smith. Deputies also conducted surveillance of Ms. Smith's business, TeRay's, a clothing store in Topeka. The deputies observed, among other things, what they considered to be counter-surveillance activity, indicating that Ms. Smith and her employees were aware that the police may have been watching them, or were at least trying to prevent such surveillance.

On December 13, 2003, two women were murdered and one was severely injured in a shooting at a Topeka residence. Phillip Cheatham, a local drug dealer, was later convicted of these murders. Annetta Thomas (the surviving victim) indicated that Mr. Cheatham was known within the community to be Ms. Smith's "flunkie" or "punk." Rec. supp. vol. I, doc. 216, at 74. Topeka Police Department homicide detectives came to suspect that Ms. Smith was involved in the murders,

2

so they obtained warrants and conducted searches of both Ms. Smith's home and her business on December 15. In her home, they found a notebook with records of drug sales, approximately $14,000 in cash, and a credit card belonging to one of the murdered women. At TeRay's (Ms. Smith's store), they found one 9mm bullet, $1200 in a candy bowl beneath the front counter, $262 in the cash register, and several digital scales. The detectives later returned the $14,000 to Ms. Smith, hoping it would encourage her to speak with them. She agreed.

On December 17, she presented herself at the police department, along with her attorney, Chris Cowger. She brokered an agreement with the detectives to provide truthful information, and in exchange she would not be charged with any drug-related offenses that occurred prior to the murders. However, Ms. Smith breached her cooperation agreement – most notably she failed to deliver promised information about a possible second shooter. Mr. Cowger later testified against Ms. Smith, telling the jury that while representing Ms. Smith, he bought small quantities of marijuana from her at her home and TeRay's. Ms. Smith did not know Mr. Cowger was going to testify against her until the prosecution called him as its last witness.

After Ms. Smith breached her cooperation agreement, officers continued to investigate her drug activities, primarily through the use of informants. One informant was Lester Campbell. Mr. Campbell went into TeRay's, asked Ms. Smith about purchasing "dope," and left his phone number. That same day, Mr.

Torrence (Ms. Smith's alleged co-conspirator), who did not previously have Mr. Campbell's phone number, called Mr. Campbell about purchasing crack. In cooperation with police, Mr. Campbell then purchased crack from Mr. Torrence three times that month.

Another informant was James Jensen. Mr. Jensen had been purchasing drugs from Ms. Smith for a few months up to the date of the double homicide. After the homicide, Mr. Jensen approached police and offered to provide information. He later made three controlled-buys – two of crack and one of methamphetamine – from Ms. Smith that month. Mr. Torrence delivered the methamphetamine, after Mr. Jensen arranged the purchase from Ms. Smith.

A third informant was Sharriff Tilghman. Mr. Tilghman made four controlled-buys from Ms. Smith, at least two of which were delivered by Mr. Torrence.

Officers searched Ms. Smith's home again in June 2005, finding a scanner and several photos of police officers, believed to be used for counter-surveillance purposes. Officers also found approximately $20,000 hidden in a crawl space.

In addition to the informants, the government presented several other witnesses, most importantly Mr. Torrence, who pleaded guilty to being a co-conspirator of Ms. Smith's. He testified that he had grown up with Ms. Smith and had dated her. He rented an apartment in her garage, and described Ms. Smith as "the kingpin" of the operation for which he worked. Rec. vol. X, at 1458. His

4

role was to sell and deliver crack for Ms. Smith. He delivered drugs to several people, including Mr. Cheatham (who was convicted of the double murder), and sold it from TeRay's as well. Mr. Torrence also testified that a few days before the murder, he heard Ms. Smith and Mr. Cheatham saying that someone had stolen money from Mr. Cheatham and he saw Mr. Cheatham crying. *Id.* at 1475. Mr. Torrence asked Ms. Smith what was wrong, and she replied, "if he allow – let somebody take $15,000 from me and nine ounces of dope, he a wuss and I don't need nobody on my team like this . . . ." *Id.*

There were various other witnesses to the conspiracy who testified. James Worford testified that he would arrange drug transactions with Ms. Smith and Mr. Torrence would deliver them. He also testified that Ms. Smith had a little notepad, just like the one police recovered at her house, where she would keep track of their transactions. Steven Bell testified that he knew Mr. Cheatham was working for Ms. Smith. He saw Ms. Smith through a window at a federal holding facility, when she made two gestures to him: one indicating that she knew Mr. Bell was "snitching" and the other indicating that she would kill him for doing so. Rec. vol. X, at 1712. Ronald Redmond was an inmate who had been in a holding cell neighboring Ms. Smith's. He testified that Ms. Smith bragged about being a "major drug figure." Rec. vol. XI, at 1919. Mr. Redmond further testified that when he noted she would get robbed if she was a woman making so much money in Chicago, where he was from, "she gave like a chuckle, like, 'Huh, some bitches

5

down here tried that before . . . but . . . I had those bitches murdered.'" *Id.* at 1920.

Annetta Thomas, the woman who was seriously injured during the double murder, also testified. She stated that she and one of the women who was killed were lovers and that she (Ms. Thomas) and Ms. Smith were good friends. Ms. Thomas was living with Mr. Cheatham at the time of the murders, and knew he was an underling in Ms. Smith's drug business. She saw him prepare and sell the drugs with Ms. Smith, and she personally purchased crack from Ms. Smith on several occasions. She also testified that prior to the shooting, Mr. Cheatham told her that a safe was missing from his room, but would not tell her its contents. He called Ms. Smith, who came over to Ms. Thomas's apartment and asked Ms. Thomas if she had taken it, "[b]ecause it was mine." Rec. supp. vol. I, doc. 216, at 91. Mr. Cheatham ultimately told Ms. Thomas that the safe had $10,000 in it. On the night of the shooting, Mr. Cheatham shot Ms. Thomas at least seven times, until she played dead. After Mr. Cheatham left, she dragged herself to the door to call for help.

After a three-week jury trial, Ms. Smith was convicted of one count of conspiracy to distribute crack cocaine, methamphetamine, and marijuana, in violation of 21 U.S.C. § 846; seven counts of managing or controlling a building for the purpose of using, storing, or distributing a controlled substance, in violation of 21 U.S.C. § 856; two counts of using a communication facility to

6

facilitate conspiracy to distribute controlled substances and distribution of controlled substances, in violation of 21 U.S.C. § 843(b); six counts of distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1); and one count of distribution of methamphetamine, also in violation of 21 U.S.C. § 841(a)(1). The district court sentenced her to 324 months' imprisonment to be followed by ten years' supervised release. Ms. Smith filed a motion for a new trial, which the district court denied.

On appeal, Ms. Smith lists nine issues. However, two of these – sufficiency of the evidence and cumulative error – are listed, but not argued. The Federal Rules of Appellate Procedure require that, "[t]he appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities . . . on which the appellant relies." FED. R. APP. P. 28(a)(9)(A). Because "[w]e will not make arguments for [Ms. Smith] that [she] did not make in [her] briefs," we decline to address these two issues that were only raised summarily. *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1257 n.1 (10th Cir. 2001).

We will address, in turn, Ms. Smith's remaining seven arguments that: (1) the district court erred in allowing the government to introduce evidence of the double murder, specifically graphic photographs; (2) the district court erred in instructing the jury that it could consider evidence of the murders even if the government had not proved Ms. Smith's participation beyond a reasonable doubt; (3) the district court erred in failing to grant Ms. Smith a new trial after the

7

government committed a *Brady* violation by not disclosing prior statements made by her attorney who later testified against her; (4) the government in bad faith intentionally destroyed exculpatory evidence when it deposited seized cash into a forfeiture account without documenting the serial numbers on the bills; (5) the district court erred in admitting evidence without an appropriate chain of custody; (6) the district court erred by not finding a *Batson* violation when the government used a peremptory challenge to remove an African-American during venire; and (7) the district court improperly applied USSG § 3C1.1 enhancement provision for obstruction of justice.

## II.  DISCUSSION

**A.    The Double Homicide**

**1.    Introduction of the double homicide evidence**

We review the district court's admission of evidence for an abuse of discretion.  *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006).  We cannot reverse a district court's ruling if "it falls within the bounds of permissible choice in the circumstances and is not arbitrary, capricious or whimsical."  *Id.* (internal quotation marks omitted).

Ms. Smith challenges the admission of evidence relating to the double murder.  The challenged evidence includes photos of the bullet-ridden deceased bodies and of the bloody clothes and bloody area of the house where the murders

8

occurred.  The government also presented evidence that the convicted murderer, Mr. Cheatham, had made nine phone calls to Ms. Smith in the minutes surrounding the murders. According to Detective Brian Hill, during one of these phone calls, Ms. Thomas (playing dead after having been shot at least seven times) heard Mr. Cheatham say, "All these bitches are dead."  Rec. vol. V, at 575.

Ms. Smith filed a pre-trial motion *in limine* to prohibit the government from presenting any evidence about the double murder.  The district court denied this motion, finding that the evidence was intrinsic to the conspiracy and was not unfairly prejudicial.

The Federal Rules of Evidence provide:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge [etc.] . . . .

FED. R. EVID. 404(b).  The Federal Rules further provide that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."  FED. R. EVID. 403.

The government first argues that because the murders were committed in furtherance of the drug conspiracy, they are part of the charged act, and therefore not an "other crime[]" subject to Rule 404(b).  On this, we agree.  "[C]onduct which occurs during the life of a conspiracy and is a part of the same is direct evidence of the conspiracy and therefore not subject to Rule 404(b)." *United*

9

*States v. Portillo-Quezada*, 469 F.3d 1345, 1353 (10th Cir. 2006). Because the evidence supported the conclusion that the double murder occurred during the life of the conspiracy and was part of it, under *Portillo-Quezada*, the district court did not abuse its discretion in admitting the evidence, finding that Rule 404(b) did not apply.

Ms. Smith also claims that she suffered undue prejudice as a result of the graphic photographs of the murder scene. We test for undue prejudice by using the balancing test in Rule 403, which provides that relevant evidence may be excluded if its prejudicial value substantially outweighs its probative value. FED. R. EVID. 403. "Rule 403 does not protect a party from all prejudice, only unfair prejudice." *Deters v. Equifax Credit Info. Servs., Inc.*, 202 F.3d 1262, 1274 (10th Cir. 2000). In order for evidence to be excluded, it must "make a conviction more likely because it provokes an emotional response in the jury or otherwise tends to affect adversely the jury's attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged." *Portillo-Quezada*, 469 F.3d at 1354 (internal quotation marks omitted).

The government relies on *Portillo-Quezada* as support for its proposition that the evidence was not unduly prejudicial because it "did not shock the jury given the evidence [the defendants] had been shot." *Id.* Specifically, the government argues that a jury would not have been unduly swayed by the photographs "[g]iven that the nature of the evidence relating to almost any murder

10

includes graphic photographs . . . ." Aple's Br. at 25. But the government, in attempting to convince us to adopt the reasoning of *Portillo-Quezada*, mistakes the facts of that case. The government claims that in that case, "[t]his Court considered *this precise issue* and found there that the introduction of similar photographs in a drug conspiracy case . . . was not unduly prejudicial under Rule 403." Aple's Br. at 25 (emphasis added). This is an incorrect account. There were no photographs at issue in *Portillo-Quezada*. Instead, the question before us in that case was whether an officer's graphic *testimony* was unduly prejudicial. 469 F.3d at 1353. *Portillo-Quezada* held that because the jury had heard testimony that the murder victim was shot at close range, the officer's testimony did not shock the jury. *Id.* at 1354.

The district court argued similarly in Ms. Smith's case, finding that the photos were not unduly prejudicial because "[t]he jury had some expectation that these photographs would be lurid given the testimony provided by the survivor of the shootings." Rec. vol. I, doc. 228, at 20 (denial of motion for a new trial). However, we must be careful not to extend this reasoning, clearly informed by *Portillo-Quezada*, too far. It is not enough that "the jury ha[ve] some expectation" of the graphic nature of the photos. Instead, the test is whether the photos would elicit such an emotional response that the jury's attitude toward Ms. Smith would be adversely affected wholly apart from its feelings as to her guilt or innocence of the drug conspiracy with which she was charged. *Portillo-Quezada*, 469 F.3d at

11

1354.

Photographs of bloodied, bullet-ridden bodies and blood-stained clothes are different than testimony of the sort at issue in *Portillo-Quezada* – they are much more shocking and much more likely to provoke an emotional response. "Under Rule 403's balancing test, it is not enough that the risk of unfair prejudice be greater than the probative value of the evidence; the danger of that prejudice must *substantially* outweigh the evidence's probative value." *United States v. Cerno*, – F.3d — , 2008 WL 2502526, at *8 (10th Cir. Jun. 24, 2008). These photos would likely have substantially more prejudicial than probative value. Indeed, if they were not intended to provoke a substantial emotional response, one must ask why the government felt the need to include them at all: it was obvious that these were two murders done with multiple bullet wounds. While evidence of the murders is certainly admissible, graphic evidence that adds nothing to the description of the bullet-ridden bodies *except* shock, is prejudicial under Rule 403. *See id.*; *Portillo-Quezada*, 469 F.3d at 1154.

"We will not reverse a district court's decision to admit evidence if it falls within the bounds of permissible choice in the circumstances . . . ." *Id.* at 1353 (internal quotation marks omitted). Determining whether admitting these gruesome photos (which depicted the aftermath of a murder that Ms. Smith was never charged for having played any part in) was within the bounds of permissible choice is a close call. However, we need not resolve this issue because any error

12

that may have occurred was harmless. A non-constitutional error is harmless unless it affects the substantial rights of a party. *United States v. Sells*, 477 F.3d 1226, 1240 (10th Cir. 2007). An error affects a substantial right when it has "substantial influence on the outcome or leaves one in grave doubt as to whether it had such effect." *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc) (internal quotation marks omitted). The government bears the burden of showing that an error is harmless. *United States v. Stiger*, 413 F.3d 1185, 1190 (10th Cir. 2005).

The government argues that even if Ms. Smith was unduly prejudiced, the error was harmless because other evidence overwhelmingly established that she was involved in a conspiracy. Substantial evidence was presented that Ms. Smith conspired with Mr. Torrence and others to distribute drugs. This evidence included Mr. Torrence's own guilty plea and subsequent testimony against Ms. Smith. There was also testimony from Mr. Worford that he had purchased large quantities of crack and marijuana from Ms. Smith. Mr. Bell testified that Mr. Cheatham worked for Ms. Smith and that Ms. Smith had twice purchased cocaine from his suppliers. Ms. Thomas testified that she had seen Mr. Cheatham and Ms. Smith cook powder cocaine into crack cocaine several times, and that Ms. Smith claimed an interest in the money that Mr. Cheatham had stolen from him. Further, the controlled-buy evidence showed that Ms. Smith and Mr. Torrence worked together to perform these transactions. Various other bits of circumstantial

13

evidence also help prove the conspiracy, such as the trash pulls from Ms. Smith's house, and the testimony that Ms. Smith had bragged about being a "major drug figure" in the Topeka/Lawrence area. Finally, evidence tied Ms. Smith to the murders and these murders to the drug conspiracy.

Because the remaining evidence against Ms. Smith was so strong, any potential error in admitting the photographs did not have a "substantial influence on the outcome" or call the verdict into "grave doubt," and therefore her substantial rights have not been affected. *Rivera*, 900 F.2d at 1469 (internal quotation marks omitted). Because her substantial rights were not violated, even if the evidence of the homicides imposed undue prejudice on Ms. Smith, any error was harmless. *See Sells*, 477 F.3d at 1240.


## 2.    Double homicide jury instruction

Ms. Smith also challenges the instruction to the jury that it could consider the double murder as evidence of the conspiracy, because the instruction did not state that the government had to prove her involvement in the murders beyond a reasonable doubt. We "review a district court's decision to give a particular jury instruction for an abuse of discretion." *United States v. Gwathney*, 465 F.3d 1133, 1142 (10th Cir. 2006). We must also "consider the instructions as a whole de novo to determine whether they accurately informed the jury of the governing law." *Id.* We will uphold a guilty verdict following an erroneous instruction if "it

14

appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Luke-Sanchez*, 483 F.3d 703, 705 (10th Cir. 2007) (internal quotation marks omitted).

At the instructions conference, Ms. Smith objected to Instruction 8, which stated:

> The government contends that defendant was involved in directing a double homicide to further the drug conspiracy alleged in Count 1. Defendant denies any involvement in the double homicide. If you believe that defendant ordered the double homicide and that it was ordered in furtherance of the drug conspiracy alleged in Count 1, then you may consider that evidence in deciding whether defendant is guilty or not guilty of Count 1. Otherwise, you should disregard the evidence of the double homicide in deciding whether defendant is guilty or not guilty of the charge in Count 1. The evidence of the double homicide should not be considered in your deliberations regarding other counts of the indictment.

Rec. vol. I, doc. 205, at 20. Ms. Smith objected because the instruction did not state that the government had to prove her involvement in the murders beyond a reasonable doubt. The district court overruled the objection.

On appeal, Ms. Smith argues, "[t]he jury was given a blank check, over defendant's objection," to determine whether she was guilty of the ordering the homicide and whether that proved that she was guilty of conspiracy. Aplt's Br. at 18. Ms. Smith quotes the standard conspiracy instruction, which requires that the jury find beyond a reasonable doubt that one of the conspirators engaged in at least one overt act furthering the conspiracy. *See* 10th Cir. Criminal Pattern Jury Instructions § 2.19 (2005). She argues that because the murder was the only overt

15

act the government tried to prove, the government had to prove it beyond a reasonable doubt. However the instruction she quotes pertains to violations of 18 U.S.C. § 371 – a general conspiracy statute –, and not the drug conspiracy statute, 21 U.S.C. § 846, under which Ms. Smith was charged.

A conviction under § 846 does *not* require proof of any overt act. *United States v. Williams*, 374 F.3d 941, 949 (10th Cir. 2004) (noting that drug conspiracies are unique in this sense). Instead, as the district court noted in its denial of the motion for new trial, "In order to convict a defendant of a § 846 conspiracy, the government must prove only the existence of a conspiracy, that the defendant knew of it, and that, with knowledge, the defendant voluntarily became a part of the conspiracy." Rec. vol. I, doc. 228, at 32. *See Williams*, 374 F.3d at 949 ("Drug conspiracies under 21 U.S.C. § 846 are unique because the government need not prove an overt act. . . . Instead, the government must prove that the defendant knew at least the essential objectives of the conspiracy and knowingly and voluntarily became a part of it."). "Although the Government need not prove an overt act to establish a conspiracy under § 846, the jury may infer an agreement constituting a conspiracy from the acts of the parties indicating concert of action for the accomplishment of a common purpose." *United States v. Delatorre*, 157 F.3d 1205, 1207 (10th Cir. 1998) (internal quotation marks omitted). Therefore, as the government notes, because the law does not require the government to prove *any* overt act, the government was not legally required to prove any such act

16

beyond a reasonable doubt.  The trial court then did not abuse its discretion in refusing to instruct the jury as Ms. Smith requested.


**B.**     ***Brady***

*Brady v. Maryland* held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. 83, 87 (1963).  This duty to disclose applies not only to prosecutors, but also to police and other government investigators.  *Kyles v. Whitley*, 514 U.S. 419, 437-38 (1995).  When a district court's denial of a motion for a new trial is based on an alleged *Brady* violation, we review the district court's decision de novo.  *United States v. LaVallee*, 439 F.3d 670, 698 (10th Cir. 2006).

A defendant seeking a new trial on *Brady* grounds must show that "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material."  *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999).  Evidence is material if it creates "a reasonable probability that, 'had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Scott v. Mullin*, 303 F.3d 1222, 1230 (10th Cir. 2002) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  "A 'reasonable probability' is a 'probability sufficient to undermine confidence in the outcome.'"

*Id.* (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

During and after the trial, Ms. Smith claimed that the government failed to provide her with exculpatory, *i.e. Brady*, material with respect to several of its witnesses, including Chris Cowger (her former attorney), Steven Bell, Sheena Davis, and James Worford. Ms. Smith specifically objected that she did not learn of the deals that each of the witnesses had with the government until or after the witness testified. The district court either overruled or denied Ms. Smith's *Brady* claims with respect to each witness. It is worth noting that the district court did find that while the government should have disclosed a police report on Mr. Cowger (detailed below), a new trial was not warranted because (1) the evidence against Ms. Smith was overwhelming, so the failure to disclose does not undermine confidence in the verdict, and (2) "the significance of Mr. Cowger's testimony in this trial was insubstantial." Rec. vol. I, doc. 255, at 9.

## 1.     Mr. Cowger

Ms. Smith did not know that Mr. Cowger, her former attorney, was going to testify against her until the government called him as the final witness. She argues that the government violated *Brady* by failing to disclose a report prepared by Sgt. Higdon, in which Sgt. Higdon reported that Mr. Cowger admitted (1) he was having an affair with a woman who had a cocaine problem; (2) he had given her money that she used to buy cocaine; (3) she was blackmailing him; (4) he was in

18

counseling for boundary issues with clients; and (5) that he had smoked marijuana with Ms. Smith on one occasion at her residence.  Ms. Smith argues that if she had had this evidence at the time of trial, it could have served to impeach Mr. Cowger's credibility, thereby undermining his claim that he bought marijuana from her on multiple occasions.

As noted above, a defendant seeking a new trial on *Brady* grounds must show that "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material." *Quintanilla*, 193 F.3d at 1149.  We must first determine whether the prosecution suppressed evidence favorable to Ms. Smith.  Impeachment evidence is exculpatory for *Brady* purposes.  *Bagley*, 473 U.S. at 676.  The district court found that the only significant impeachment evidence from the report was the fact that Mr. Cowger had smoked marijuana with Ms. Smith at her home, and that the rest lacked relevance to the case.  We agree.  *United States v. Combs* holds that drug use of a witness should be disclosed under *Brady*.  267 F.3d 1167, 1175 (10th Cir. 2001).

The government conceded that it did not disclose this report, and argued that at the time of trial it did not know that the report existed.  However, a defendant may base a *Brady* claim on a piece of material evidence not disclosed by an investigator, even if the prosecutor did not know of the evidence.  *Kyles*, 514 U.S. at 437-48.  Sergeant Higdon, a State investigator, knew about this report well in advance of the trial, so even if the prosecutor did not know it existed, Ms. Smith

19

could still base her *Brady* claim on the failure to disclose the report.

However, as noted above, even if the government suppressed evidence that was favorable to her, in order to receive a new trial on *Brady* grounds, Ms. Smith must also show that the evidence was material. *Quintanilla*, 193 F.3d at 1149. Evidence is only material if it creates "a reasonable probability that, 'had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Scott*, 303 F.3d at 1222 (quoting *Bagley*, 473 U.S. at 682 ). "A 'reasonable probability' is a 'probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). As detailed above, the other evidence against Ms. Smith was overwhelming. Considering the weight of Mr. Torrence, her co-conspirator's, confession and testimony against her, along with the informants' testimony and that of numerous additional witnesses, the testimony of Mr. Cowger was not a crucial part of the government's case. Ms. Smith argues that Mr. Cowger was different than the rest of the witnesses because he was an attorney and therefore a more credible witness. However, the other testimony against Ms. Smith was still overwhelming. The critical question is whether the lack of impeachment evidence shakes our confidence in the guilty verdict. *Kyles*, 514 U.S. at 434. Because it does not, even though the government violated the first two prongs of *Brady* by suppressing evidence favorable to Ms. Smith, the third prong of *Brady* is not met – *i.e.*, the evidence is not material –, and Ms. Smith was not entitled to a new trial. *See Quintanilla*, 193 F.3d at 1149.

20

**Mr. Bell, Ms. Davis, and Mr. Worford**

Ms. Smith also contends that the government violated *Brady* by failing to provide impeachment evidence regarding three witnesses, Steven Bell, Sheena Davis, and James Worford. Specifically, she argues that the government violated *Brady* by waiting until direct examination to disclose that these three witnesses had each made some agreement with the government in exchange for their testimony. Aplt's Br. at 46. However, Ms. Smith does not dispute that the government did disclose each of these witness's agreements during direct examination.[1] "The *Brady* rule is not violated when the material requested is made available during trial." *United States v. Rogers*, 960 F.2d 1501, 1510 (10th Cir. 1992). Because the government made this information available at trial, there was no *Brady* violation with respect to these three witnesses.

**C.    Other evidentiary issues**

**1.    The government's failure to maintain seized cash**

---

[1]Rec. vol. X, at 1661-64 (Mr. Bell testifying that although he was not promised anything, it was his understanding that if he got on the stand to "tell nothing but the truth," about Ms. Smith, then the government would bring no further charges against him); Rec. vol. XI, at 1761-63 (the prosecution and counsel for Ms. Davis stated that there was an understanding that if Ms. Davis testified, she would not be prosecuted); Rec. vol. X, at 1589-94 (Mr. Worford testifying that Sgt. Higdon assured Mr. Worford that he would not bring charges against him for possessing marijuana if he testified).

21

We review a district court's determination that the government did not destroy potentially exculpatory evidence for clear error. *United States v. Pearl*, 324 F.3d 1210, 1215 (10th Cir. 2003). "The inquiry into allegations of prosecutorial bad faith presents a mixed question of fact and law in which the quintessential factual question of intent predominates." *United States v. Bohl*, 25 F.3d 904, 909-10 (10th Cir. 1994). The burden is on Ms. Smith to show bad faith. *United States v. Beckstead*, 500 F.3d 1154, 1157 (10th Cir. 2007), *cert. denied*, 128 S.Ct. 1757 (2008).

On June 2, 2005, officers found approximately $20,000 during a search of Ms. Smith's home. The government did not photocopy the bills or otherwise record their serial numbers. Pursuant to the Shawnee County Sheriff's Department policy, they deposited the bills into an asset forfeiture fund.

At trial, the government argued that drug dealers frequently turn over large sums of money quickly. Ms. Smith argues that if the government had recorded the serial numbers on the bills, she could have shown that some of the money the officers seized in this 2005 search was also seized in a 2003 search. This, Ms. Smith claims, would have shown that she did not turn over money quickly, supporting her claim that she was not, in fact, trafficking drugs.

To establish that the government deprived her of her due process rights by destroying potentially exculpatory evidence, Ms. Smith "must show both that 1) the evidence destroyed was potentially exculpatory and 2) the government acted in

bad faith in destroying it." *Beckstead*, 500 F.3d at 1158. These principles were articulated by the Supreme Court in *California v. Trombetta*, 467 U.S. 479 (1984) and *Arizona v. Youngblood*, 488 U.S. 51 (1988). Here, Ms. Smith's due process rights were not violated, because the serial numbers on the cash were not exculpatory. They would not have proven her innocence but shown only that perhaps she handled her money differently than a typical drug dealer.

Even if the evidence was potentially exculpatory, Ms. Smith has presented no evidence that the police acted in bad faith. "[U]nless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Youngblood*, 488 U.S. at 58. The seized cash was put into an asset forfeiture fund according to the procedure laid out in the Sheriff's Department policy. Rec. vol. VII, at 801-02. Generally, destroying the evidence according to an established government procedure "precludes a finding of bad faith absent other compelling evidence." *Beckstead*, 500 F.3d at 1159 (internal quotation marks omitted). Ms. Smith provides no such compelling evidence. She only speculates that "[t]he State presumably was concerned that holding money from a suspect may be problematic if the suspect seeks or requests interest on money that is being held" and that if the money was deposited, the state would get the interest, not Ms. Smith. Aplt's Br. at 43. This speculation alone is not "compelling evidence" that the government acted in bad faith.

23

In considering whether the government acted in bad faith, we look to such factors as: (1) whether the government had explicit notice that Ms. Smith believed the money was exculpatory; (2) whether the claim that the evidence is potentially exculpatory is conclusory, or instead "backed up with objective, independent evidence giving the government reason to believe that further tests of the [destroyed evidence] might lead to exculpatory evidence"; (3) whether the government could control the disposition of the evidence once Ms. Smith indicated that it might be exculpatory; (4) whether the evidence was central to the case; and (5) whether the government offers any innocent explanation for its disposal of the evidence. *Beckstead*, 500 F.3d at 1160-61 (alterations in original) (citing *United States v. Bohl*, 25 F.3d 904, 911-13 (10th Cir. 1994)). The government has offered an innocent explanation – the officers were simply complying with department policy. Because Ms. Smith has not presented compelling evidence that any of the other factors indicating bad faith were present, the district court did not err in denying her motion for a new trial on this ground.

## 2.    Proper chain of custody of drugs obtained by an informant

During the trial, the government moved for admission of exhibits of crack cocaine that Sharriff Tilghman had purchased from Mr. Torrence on at least three occasions. (While Mr. Torrence delivered the drugs, the sales were arranged through Ms. Smith.) Mr. Tilghman did not wear any recording device during the

24

transactions with Mr. Torrence. He also did not testify at Ms. Smith's trial. Ms. Smith objected that the government did not establish an adequate chain of custody for each exhibit. The district court denied Ms. Smith's objection during the trial and denied relief in its order denying a new trial. We review evidentiary rulings for abuse of discretion. *United States v. Ramirez*, 479 F.3d 1229, 1245 (10th Cir. 2007).

As the government notes, in order for a chain of custody to be adequate, it "need not be perfect. Where the chain of custody is imperfect, deficiencies . . . go to the weight of the evidence, not its admissibility; once admitted, the jury evaluates the defects and, based on its evaluation, may accept or disregard the evidence." *United States v. Humphrey*, 208 F.3d 1190, 1205 (10th Cir. 2000) (internal quotation marks and citations omitted). Therefore, it was for the jury to weigh whether the officers' testimony was sufficient to establish a sufficient foundation for the evidence.

As to the first buy, Deputy Harry Bowen testified that officers searched Mr. Tilghman before the buy, conducted both visual and audio surveillance of the transaction, seized the drugs immediately after the buy, produced a recording of a phone call between Ms. Smith and Mr. Tilghman setting up the buy, and produced an audiotape of the buy from Mr. Torrence. Rec. vol. IX, at 1303-16. With respect to Mr. Tilghman's second and third controlled buys, Deputy Bowen testified that they searched Mr. Tilghman before the buys, conducted visual

25

surveillance of the transactions, and seized the drugs immediately afterwards. *Id.* at 1319-26; 1343-46.

Even though some of the controlled buys were without audio surveillance, because, under *Humphrey*, any doubts regarding the foundation go to the weight the jury gives the evidence and not to its admissibility, the district court did not abuse its discretion in admitting it. *See Humphrey*, 208 F.3d at 1205.


**D.     *Batson***

Ms. Smith also challenges the government's peremptory challenge against an African-American potential juror. *Batson v. Kentucky*, 476 U.S. 79 (1986) provides a three-step process for a trial court to follow when determining whether a peremptory challenge was based on race. "First, a defendant must make a prima facie showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination." *Snyder v. Louisiana*, 128 S. Ct. 1203, 1207 (2008) (internal quotation marks, citations, and alterations omitted). When considering a *Batson* claim, we review de novo whether the proffered explanations were race-neutral. *United States v. Barrett*, 496 F.3d 1079, 1105 (10th Cir. 2007).

Ms. Smith argues that the government violated *Batson* by using a

26

peremptory challenge against an African-American woman, Ms. Campbell. The government here offered three race-neutral reasons for striking Ms. Campbell. First, it inferred that Ms. Campbell had been an unsatisfactory employee based on the fact that she had not been hired full-time in a previous grant position. Second, the government expressed concern that she had not yet found another job. Third, the government was concerned that Ms. Campbell had taken some law school courses, but had since dropped out. Aple's Br. at 55. Ms. Smith, without more argument, says merely that these reasons were "insufficient." Aplt's Br. at 49. "A race-neutral explanation is simply an explanation, no matter how implausible, that is based on something other than the race of the juror." *Barrett*, 496 F.3d at 1105. In providing these three reasons then, the government met its burden of providing race-neutral reasons for removing Ms. Campbell from the jury.

We next turn to the ultimate question of whether Ms. Smith proved that these reasons were evidence of discriminatory intent. *See Snyder*, 128 S. Ct. at 1207. We review for clear error a trial court's ruling on whether the prosecutor intentionally discriminated. *Id.* "The district court's answer to the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal, because such a finding largely turns on the trial court's evaluation of the prosecutor's credibility." *United States v. Nelson*, 450 F.3d 1201, 1207 (10th Cir. 2006) (internal quotation marks omitted). As in *Barrett*, Ms. Smith gave the district court "no reasonable basis for questioning the

27

government's credibility in offering its race-neutral reasons," *Barrett*, 496 F.3d at 1106. Because Ms. Smith did not meet her burden of showing discriminatory intent, *see Snyder*, 128 S. Ct. at 1207, the district court did not clearly err in determining that there was no *Batson* violation.

## E.     Sentencing

Ms. Smith "challenges only the procedural reasonableness of [her] sentence, which requires, among other things, a properly calculated Guidelines range." *United States v. Saavedra*, 523 F.3d 1287, 1289 (10th Cir. 2008). Specifically, she challenges the district court's application of the obstruction enhancement under USSG § 3C1.1. When considering a challenge to an application of the Sentencing Guidelines, we review a district court's legal interpretation of the Guidelines de novo and its factual findings for clear error. *United States v. Chee*, 514 F.3d 1106, 1116 (10th Cir. 2008). The Guidelines require that an offender's offense level be increased by two levels:

> [i]f (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to . . . the defendant's offense of conviction . . . ."

USSG § 3C1.1.

The district court's application of this enhancement was based on Mr. Worford's testimony. He testified that after he appeared before the grand jury,

28

Ms. Smith confronted him in person and asked, "Are you snitching?" Rec. vol. X, at 1628. He also testified that she called him and asked again if he was "snitching" because people had seen him coming out of the courthouse. *Id.* When asked on cross-examination if Ms. Smith had ever threatened him, Mr. Worford said, "Not directly, but it was just – you could tell. I mean, I can tell when . . . It was just the way people, you know, ask you stuff you can tell, I can tell." *Id.* at 1653.

Obstruction under § 3C1.1 includes "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or jury, *directly or indirectly*, or attempting to do so." USSG § 3C1.1, cmt. 4(a) (emphasis added). "Commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *United States v. Torres-Ruiz*, 387 F.3d 1179, 1181 (10th Cir. 2004) (internal quotation marks omitted).

Because Ms. Smith has presented no evidence that the relevant commentary violates her constitutional or statutory rights, or that it is inconsistent with or a plainly erroneous reading of § 3C1.1, and because that commentary states that even indirect threats fall under § 3C1.1's offense-level increase, the district court did not clearly err in applying § 3C1.1 to Ms. Smith's sentence.

Ms. Smith summarily raises two other complaints about her sentence, but does not make arguments or cite authority with respect to either. *See* FED. R. APP.

P. 28(a)(9) ("The appellant's brief must contain . . . appellant's contentions and the reasons for them, with citations to the authorities . . . on which the appellant relies.").

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Ms. Smith's conviction and sentence.